**Abner Junior STEPHENS, Appellant,**

v.

**J. D. COX, Superintendent, Virginia State Penitentiary, Appellee.**

**No. 15111.**

United States Court of Appeals, Fourth Circuit.

Oct. 12, 1971.

Henry W. McLaughlin, III, Halifax, Va. (Court-assigned counsel), [Henry W. McLaughlin, Jr., and McLaughlin & McLaughlin, Halifax, Va., and F. Guthrie Gordon, III, and Lowe, Dwoskin & Gordon, Charlottesville, Va., on the brief], for appellant.

Overton P. Pollard, Asst. Atty. Gen. of Virginia (Andrew P. Miller, Atty. Gen. of Virginia, on the brief), for appellee.

Before HAYNSWORTH, Chief Judge, WINTER, Circuit Judge, and MILLER, District Judge.

HAYNSWORTH, Chief Judge:

The petitioner, having exhausted his state remedies, sought habeas corpus relief in the district court on the ground that systematic discrimination was practiced against Negroes in the selection of grand and petit juries in Halifax County, Virginia in 1968, the year in which he was tried for murder. Relying on a hearing conducted at the petitioner's trial in the state court, the district court dismissed the petition, 315 F.Supp. 821. We find the state court hearing inadequate for the resolution of the issue presented, and remand for an evidentiary hearing. Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770.

At trial, Stephens moved to quash the indictment against him on the ground of discrimination. A hearing was held, and evidence was introduced as to the method of jury selection and the racial make-up of previous grand and petit juries in Halifax County. The motion was denied on the ground that systematic exclusion of Negroes had not been shown.

Petit and grand juries are drawn from the city of South Boston and the eight magisterial districts of Halifax County. For each year a panel of three hundred prospective petit jurors, apportioned according to the population of the city and the eight districts, is selected by jury commissioners, five in recent years, appointed by the court. Since 1965 Negroes have served on the commission in each year. The selection process is not entirely clear from the record. Jury commissioners are required to select persons "of good repute for intelligence and honesty"[1] and are guided in this endeavor by a list of statutory disqualifications and exemptions.[2] Before 1965 the primary source of names was the poll tax list, on which individuals were designated by race. Since that time non-racially designated lists, principally the personal property tax lists, have been used. Jury commissioners are not limited to any list and may rely on personal knowledge to some extent. To what degree they do so is not revealed in the record. Once three hundred persons have been selected, the names are printed on identical individual slips, folded, and placed in a ballot box. Six times a year the clerk draws a venire, usually consisting of twenty four persons, from the box.

In the late 1950's and early 1960's as few as 5.55 per cent of the persons

---

1. Va.Code § 8–181.

2. Va.Code §§ 8–174, 175, 178, 182.

drawn from the box for service were Negroes. However, their representation has steadily increased. For the three years between 1965 and 1968 Negroes constituted 15.74 per cent of the 432 persons drawn for service. The number of Negroes on individual venires during that time ranged from one (4.167 per cent) to nine (40.90 per cent).[3] For the year in which Stephens was tried Negroes constituted 22, or 15.1 per cent of the 146 jurors in the six venires.

Grand jurors are chosen from a list of sixty persons selected by the court. The selection criteria are unknown except for the statutory requirement that those selected be persons "of honesty, intelligence and good demeanor" and that the list be apportioned ratably according to the population of the magisterial districts.[4] From the list of sixty the clerk selects panels of five to seven persons for each of the six terms of court. In selecting panels he is required to draw grand jurors ratably from each of the magisterial districts as nearly as possible.[5] Additionally, the clerk testified in the state hearing that in selecting grand juries he attempted, insofar as it was possible within the limitation of the requirement that all or as many as possible of the districts be represented, to place Negroes on as many grand juries as their number on his list of sixty allowed. For the year 1967–68 the six grand juries included six Negroes, or 14.64 per cent[6] of the total, one on each grand jury. No more than three had served in any previous year.

In 1950 Negroes constituted 36 per cent of the adult population of South

Boston and Halifax County. Their proportion declined to 34 per cent in 1960. Figures for later years are not in the record.

The petitioner's evidence thus demonstrates that at the time he was tried Negroes constituted only about 15 per cent of the grand and petit jurors selected for service, although they constituted probably more than 30 per cent of the adult population. Thus a disparity of approximately 2–1 existed between the proportion of adult Negroes and their representation on juries. No evidence of actual discrimination was offered.

The Constitution forbids not only the exclusion of Negroes from jury service, but all discrimination by race. Whitus v. Georgia, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599; Witcher v. Peyton, 4 Cir., 382 F.2d 707. A token inclusion of Negroes is also forbidden. Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759; Akins v. Texas, 325 U.S. 398, 65 S.Ct. 1276, 89 L.Ed. 1692.

■■ A showing that a substantial disparity exists between the proportion of presumptively qualified Negroes in the general population and their proportion on juries will establish a *prima facie* case of racial discrimination, if the disparity is coupled either with additional positive indicia of discrimination or with a showing that the selection procedure provides an "opportunity for discrimination." Whitus v. Georgia, supra, 385 U.S. at 552, 87 S.Ct. 643; Witcher v. Peyton, supra. Unlike the case in *Witcher*, the petitioner here has shown

---

3. In view of the substantial changes made in selection procedures in 1965, including the appointment of Negro jury commissioners, abandonment of racially designated source lists, and the resulting significant increase in Negro representation, we do not regard the figures presented for earlier years as more than minimally relevant.

4. Va.Code § 19.1–148.

5. Id. Some adjustments must be made, since there are nine districts including

South Boston, and not more than seven persons may sit on one grand jury.

6. Our calculation of this figure lies between that claimed by the petitioner (13.655 per cent) and that estimated by the district court (15.8 per cent). We are unable to account for either figure from the tables submitted. As nearly as we can determine from the record, forty one persons, including six Negroes, served in 1967–68. No more than seven persons may serve on any grand jury. The discrepancy is of no significance, however.

no additional indicia of discrimination.[7] However, the opportunity to discriminate has been shown. Whether that opportunity was used, resulting in the disparity of 2–1 which we think may properly be regarded as substantial, is the unresolved issue which requires a hearing.

■ The selection of petit jury venires from the list of three hundred, the petitioner admits, is completely impartial. However, that may not be the case in the preparation of the original list. The race of most prospective jurors is known to the commissioners, and their selection criteria may include their personal acquaintance with the persons to be selected. Where personal knowledge is a factor, a charge of discrimination may not be avoided by a showing that sufficient qualified Negroes were unknown to the selecting officials. There is a duty to learn who is qualified. Turner v. Fouche, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567. The same principle is applicable to the preparation of the list of potential grand jurors.

Although we agree that the petitioner's evidence entitles him to a hearing with the burden of proof on the Commonwealth, we must reject his alternative contention that he has conclusively demonstrated discrimination and is entitled to relief from his conviction immediately.[8] Discrimination has not been shown; it is, at this point, simply

---

7. In *Witcher* there were a number of additional factors not present here. In addition to the greater disparity there of approximately 4–1, it was shown that the names of prospective jurors were taken from racially segregated lists and were noted and separated by race on the jury lists. No Negro had ever served as a jury commissioner. There were allegations of systematic and persistent use of peremptory challenges by the prosecution to eliminate Negroes from actual service at trial, and of conscious and deliberate limitation of Negroes to not more than one per grand jury.

Petitioner here argued in his brief that it was inferable from the clerk's testimony that he had followed a practice of deliberately limiting grand juries in Halifax County to not more than one Negro, implying that there was a design to limit grand juries so that the affirmative vote of a Negro was never necessary to return an indictment. (In order for a Negro's affirmative vote to be necessary to indict, it would be necessary for the usual seven-member grand jury to contain four Negroes, an overrepresentation much greater than the degree of underrepresentation shown here.) However, in oral argument he agreed that the more rational inference is to the contrary—that given a list of prospective grand jurors with a limited number of Negro names, he sought to use as many of them as he could consistent with other selection requirements, and that he sought to use them in such a way that as many grand juries as possible would be integrated. The distinction between conscious limitation and conscious integration may be a fine one;

however, failure to make it would place local officials in the intolerable dilemma of being damned regardless of what they do, a dilemma which the Court of Appeals for the Fifth Circuit refused to impose in Brooks v. Beto, 366 F.2d 1.

A conclusion that the clerk's efforts to make the fullest possible use of the names of Negroes on his list does not amount to a forbidden practice does not, of course, insulate the selection of grand jurors from all attack. The fact that such efforts were required at all, and that a noticeable disparity existed despite them, suggests that the pool of names available to him was substantially unrepresentative.

8. This contention is based principally on an attempt to demonstrate the statistical improbability of juries with the characteristics known to exist in Halifax County having been selected in a non-discriminatory manner. As such, it claims much more for statistical method than does the author of the theory of its application to legal decisions. See Finklestein, The Application of Statistical Decision Theory to the Jury Discrimination Cases, 80 Harv.L.Rev. 338. At most, statistical decision theory can demonstrate the mathematical probability of a jury, or series of juries, with a particular racial composition, having been selected by a purely random method, if the probability of selecting an individual Negro or white juror is known.

Even if randomness were the criterion of constitutionality, and it is not, it would be erroneous to assume that a showing of improbability based on raw population data amounts to proof. Aside from the

presumed. The state has the opportunity, and may be able, to show that the disparities here are not the result of racial discrimination. Such facts as are known about the selection process are much more favorable to the state's claim of non-discrimination than in most cases requiring hearings. It has long been recognized that many considerations entirely lawful and non-discriminatory may operate unequally on different racial groups. For example, it is well known that in many areas of the nation Negroes as a group have been deficiently educated in comparison to whites. In Witcher v. Peyton, 4 Cir., 405 F.2d 725 we were told by the petitioner's attorney that the average Negro adult in Pittsylvania County, Virginia [9] had only a fourth grade education in 1963. It may be that the same situation obtained in Halifax County in 1967. If so, it would effect a substantial reduction in the pool of qualified Negroes in the county. Virginia law has many other disqualification and exemption provisions, none of which are discriminatory.[10] Some of these, by an entirely impartial operation, may disqualify more Negroes than whites.[11]

Women in Virginia are automatically excused from grand or petit jury service if they request it.[12] It has been suggested that because of economic hardship or other factors a greater proportion of Negro women than white desire to be excused from service.[13] However, we know of no case in which evidence of the accuracy of that suggestion has been presented.

There are many possible circumstances which, if they exist here, might account lawfully for the observed disparity. The suggestion of their possible existence is not enough, however. It must be demonstrated by the Commonwealth when the facts shown by the petitioner,

necessity of correction to reflect the qualified population, there is the possibility of producing an impressive but quite misleading probability figure by extending the sample through an irrelevant period of time. In this case, for example, the petitioner includes probability calculations based on the aggregate racial proportions of juries dating back over twenty years, despite the fact that racial percentages changed to an unknown degree through that time, and that near the end of the twenty years the method of jury selection and the racial proportions of juries underwent marked changes.

An attempt to gauge discrimination by probability calculation is likely to be simplistic. Halifax County is not, for purposes of jury service, a single population, but nine separate populations, the racial proportions of which are known to vary substantially. The effect of combining several such populations into a single jury system on the probable racial composition of juries required to be selected from all such elements may be calculable but is likely to be cumbersome.

Most importantly, the implicit equation of "non-random" with "unconstitutionally discriminatory" (see Finklestein, supra, at 372) is erroneous. Consciousness of race in the selection process is sometimes necessary to avoid discrimination, as in Turner v. Fouche, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567, in which the duty to seek out unknown portions of the population for qualified Negro jurors was made clear, or in Brooks v. Beto, 5 Cir., 366 F.2d 1, where the avowedly intentional inclusion of two Negroes on a grand jury list of sixteen, an inclusion precipitated by the trial judge's realization of the implications of his county's history of having all-white grand juries, was upheld. Race consciousness may be unavoidable in an area such as Halifax County, whose population is small and where the clerk was able from memory to state the race of the overwhelming majority of persons who had served as jurors in the preceding several years. The mere consciousness of a racial element is likely to affect the selection process of the jury commissioners or the clerk, even unwittingly.

9. Pittsylvania County is immediately adjacent to Halifax County.

10. Va.Code §§ 8–174, 175, 178.

11. Of course, it is also possible that the reverse may be true.

12. Va.Code §§ 8–182, 19.1–148.

13. See State v. Barksdale, 247 La. 198, 170 So.2d 374; Witcher v. Peyton, 4 Cir., 405 F.2d 725, 730 (dissenting opinion of MacKenzie, D. J.).

*prima facie* are indicative of discrimination.

The order dismissing the petition is vacated, and the case is remanded for further proceedings consistent with this opinion.

Vacated and remanded.