**Herbert Louis HOPE, Petitioner,**

v.

**C. C. PEYTON, Superintendent, Virginia State Penitentiary, Respondent.**

**Civ. A. No. 69–C–40–D.**

United States District Court,

W. D. Virginia,
Danville Division.

March 30, 1972.

198

---

William E. Anderson, Danville, Va., for petitioner.

Gilbert W. Haith, Asst. Atty. Gen., Richmond, Va., for respondent.

## OPINION

WIDENER, Chief Judge.

The petitioner was convicted of robbery in the Corporation Court of the City of Danville, March 14, 1968. He was tried by a jury, which convicted him and fixed his punishment at thirty years in the penitentiary.

He appealed his conviction to the Supreme Court of Appeals, which did not grant a writ of error.

He now petitions this court for relief from his sentence by way of habeas corpus. As grounds for relief, his petition states the following:

1. Systematic discrimination against members of my [black] race in the selection of jury.

2. The trial judge struck a venireman for cause which was without cause. The venireman happened to be black.

3. A confession was improperly admitted.

4. The jury was not truly of a cross section of the community. Those jurors who had conscientious scruples against the death penalty were excused.

The assignments of error and the petition for writ of error assigned only the following grounds:

1. Systematic discrimination against members of the black race in the selection of the jury.

2. The admissibility of the confession.

The respondent answered the petition here stating that the assignments of error contained in the appeal are the same as the allegations contained in the petition, and that the petitioner had exhausted his state remedies. The record of the state trial was filed, and, in addition, an *ore tenus* hearing was afforded the petitioner in this court.

Later, the respondent, in an additional memorandum of authorities, claimed non-exhaustion of state remedies, which, had it been pleaded at first, would have been good as to all, or almost all, of the contentions of the petitioner in this court.

█ The claim of non-exhaustion, however, was made after the trial, and the court will consider all the matters raised by the petition about which evidence was offered, and, so as to be perfectly fair to the petitioner, will dismiss, without prejudice, for failure to exhaust state remedies, under 28 U.S.C. § 2254, those claims in the petition here which were, in fact, not exhausted and about

which no evidence was offered in this court.

Claim 1, that of systematic discrimination against black people on the jury, was not presented to the trial court but was argued to the Supreme Court of Appeals, and evidence was presented as to that ground here. It will be considered on its merits.

Claim 2 will be considered here in the context that the petitioner claims that the court's excusing one of the black jurors for cause made it possible for the Commonwealth to strike all the other black jurors from the venire with peremptory challenges.

Claim 3 was properly considered by the trial court and the Supreme Court, and will be considered here.

■ Claim 4 was considered neither by the trial court nor the Supreme Court, and will not be considered here. No objection was made to the action of the trial court in seating the jurors after their questioning about conscientious scruples concerning the death penalty, although the defense attorney requested, and was granted, a hearing in chambers, out of the presence of the jury, on the matter concerning the court's excusing the black venireman for cause. No question was made of the matter in the assignments of error or in the petition for writ of error. No authorities were cited to the Supreme Court of Appeals concerning this contention, and, in fact, the only mention that is made of the matter is in recital of some of the evidence in the petition for writ of error, which is obviously only an introduction into the examination of the black venireman. Bringing the matter up here at this stage of the proceeding is obviously an afterthought, since neither state court

has considered the matter. The petition as to claim 4 will be dismissed, without prejudice.[1]

The record of the case shows that the petitioner robbed, at gun point, the Security Bank and Trust Company in Danville. He made his getaway from the bank in an automobile and was run down and disarmed by an insurance agent who happened to be in the bank at the time of the robbery. The petitioner's captor held the petitioner at gun point for about twenty-five minutes awaiting the police. The insurance agent fired two warning shots close to the petitioner, when he hesitated in complying with his captor's orders on one occasion and when it looked as if the petitioner might try to get up off the ground on another occasion. The officer who first answered the call handcuffed the petitioner and held him in his car until two detectives arrived, at which time the petitioner was turned over to the detectives. No statement made by the petitioner to the first officer arriving on the scene is at issue in this case. The detectives recovered the petitioner's pistol and the money stolen from the bank, $5,021.00, from the seat of the petitioner's car. When the detectives put the petitioner in their car, one of them advised him of his rights as follows:

"I advised him that he didn't have to make any statement concerning the robbery to me, that anything he did say to me could be held against him in Court, and that it would be used against him in Court. I advised him that he had a right to an attorney, and to consult with an attorney before telling us anything. I told him that if he couldn't afford an attorney, that one would be appointed for him, and that if he did want to have anything to say about it, he could stop at any time he chose."

1. The contention, in any event, is of very doubtful validity. Where prospective jurors are excluded because of conscientious or religious scruples against capital punishment, only the death sentence is invalidated. Such an exclusion should have no bearing on the question of guilt. United States ex rel. Davis v. Henderson, 330 F.Supp. 797 (W.D.La.1971). See Cofflin v. Cox, 317 F.Supp. 86 (W.D.Va.1970) where the court held that where the death penalty had been expressly waived by the prosecution, the defendant was not denied a fair trial.

In the police car, having been advised of his rights, the defendant told the detectives that he wasn't trying to deny the robbery, that he had done it, and that all he wanted to do was be cooperative and come out of it as well as he could. He was neither threatened nor promised anything by the detectives, and he admits this in his own testimony in the *ore tenus* hearing in this court. He was taken to the police station and signed a recital and waiver of his Constitutional rights as to confessions as follows:

> "Before we ask you any questions, you must understand your rights. You have the right to remain silent. Anything you say can be used against you in Court. You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning. You have this right to the advice and the presence of a lawyer even if you cannot afford to hire one. We have no way of giving you a lawyer but one will be appointed for you if you wish, if and when you go to Court. If you wish to answer questions now, without a lawyer present, you have the right to stop answering questions at any time. You also have the right to stop answering at any time until you talk to a lawyer." And then the waiver below says, "I have read the statement of my rights shown above. I understand what my rights are. I am willing to answer questions and make a statement. I do not want a lawyer. I understand and know what I am doing and no promises or threats have been made to me and no pressure of any kind has been used against me."

▇ The petitioner has a master's degree and had been teaching school for thirteen years at the time. He signed a statement which was a full confession of the details of the planning and execution of the bank robbery. The trial court properly heard the evidence concerning the admissibility of the confession in chambers, and the only ground of objection as to the confession was that the defendant was highly nervous at the

time he made it. The trial court quite properly overruled the objection and admitted the confession into evidence. *Miranda,* infra.

When the case was called for trial, of the veniremen who had been summonsed to appear for the trial of the case, the bottom twenty on the list were first examined as to their qualifications, by agreement of the parties. Five of this number were black. One of the black veniremen was excused by the court for cause after the following colloquy in response to the question as to whether or not they could consider the case on the law and the evidence:

> "Venireman: Well, now, I was just thinking here, sometimes things that is being done, there is some cause that they is being done. You have a cause for them being done.
>
> Judge Aiken: What is that now?
>
> Venireman: There is a cause for things being done. You take, we have men over in Vietnam you can kill 'cause they have a cause for doing it. I don't know what kind of position this fellow was in unless he explains himself. I believe in giving a man fair justice as far as his statement, but sometimes the cause of a thing makes a difference and . . .
>
> Judge Aiken: Mr. Juror, I don't know just what you mean by a "cause". Do you want to know the reason why he . . .
>
> Venireman: That's right. Some reason why he did this thing. Some cause for it.
>
> Judge Aiken: Would it make any difference to you if he had a good personal reason for wanting that money? Would that make any difference to you?
>
> Venireman: Well, sometimes a man, if he is backing me up, I'd probably do things. Sometimes people do things, just like I spoke about people getting killed over in Vietnam. They got somebody to back them up, and I ain't going to walk up and kill a man unless somebody is backing me up.

Judge Aiken: This is not a question of anybody killing anybody. This man is not being tried for . . .

Venireman: Well, I don't know whether he had in mind to kill anybody. He might just have gotten to a place that he needed some money.

Judge Aiken: Well, now, if he was in a position where he needed money, would that affect your judgment as to his guilt or innocence?

Venireman: Well, of course, there is other ways that you can go to people and get money, but sometimes, you feel like you have the weight of the world. You know, sometimes, people got the weight of the world.

Judge Aiken: You are excused. You may stand aside."

The petitioner's attorney was afforded an opportunity to question the veniremen, and did so, and, when asked by the court, stated that he made no objection to the venire. The venire, at that point, consisted of four black people and sixteen white people. After the Commonwealth and the defendant had exercised their four peremptory challenges under Virginia law, the defendant's attorney asked to be heard in chambers, and, when there, the defendant's attorney moved for a mistrial on the ground that there was no black person left on the twelve-member panel which was trying the case. The only reason advanced at this time was stated as follows:

". . . in view of the fact that the defendant is a colored man, we feel very strongly that he should have some representation of his race on the jury to serve on this particular panel that we have here."

No objection was made to the venire. No suggestion was made that the venire was improperly constituted. No motion was made to quash the venire. No offer of any evidence concerning the racial makeup of the venire was offered, and, all in all, in a technical review of the record, which really ought to be had, the defendant knowingly waived every right he had at the time concerning the racial makeup of the jury, with the sole exception that he was entitled to have representation from his race on the trial panel. There was no doubt that the race of the jurors was on the attorney's mind at that time, as is conclusively shown by his actions and objections, and there is no doubt that the race of the jurors was on the defendant's mind at that time, for he so testified in his *ore tenus* hearing in this court.

The 1970 census shows the City of Danville to have 46,391 people, of which 10,595 are black, a percentage of 22.4%. Unfortunately, the census publication does not break down the black population into age groups so that the percentage 21 years of age and over can be computed, but from the official statistics it is shown that, for 14 years of age and under, there are 11,371 persons, of which 3,262 are black, or 28.7%; for 15 through 24 years of age, there are 8,184 people, of which 866 are black, or 22.8% for 25 years of age and over, there are 26,846 people, of which 5,497 are black, or 20.0%. The census figures indicate that the older the age group, the lower the percentage of black people, and it is only fair to conclude, giving the benefit of every doubt to petitioner, that not more than 22% of the total population of Danville 21 years of age and over is black. Actually, the percentage figure is probably somewhat lower.

Exhibits filed in the case indicate that, from January 5, 1960 to March 5, 1968, the total number of white jurors drawn from the jury box was 2,534, and the total number of black jurors was 269, or 89.39% white and 10.61% black. This is not broken down by year in the exhibit which has been re-submitted in this case and had been previously used in another case in this court concerning a Danville jury in the year 1960.

In February, 1968, four jury commissioners were appointed and made up the list of names to be placed in the box from which the veniremen in question here were drawn. The names used by the jury commissioners were the voting

registration books of the City of Danville. The jury commissioners were instructed that the list they compiled should represent a cross-section of the community. It should include qualified members of the various races and occupations residing in the city. "It does not mean that there should be any mathematical formula or proportion, but it does mean that there should be no discrimination by excluding qualified jurors because of race, color, religious affiliation, or sex." Two of the jury commissioners testified, and nothing in their testimony or in the jury lists which were compiled by them and the two other commissioners indicates that they did anything other than give strict adherence to the instructions they had been given.

The evidence of a witness was introduced to show an analysis of names drawn from the jury box for certain terms of court in Danville. The witness was called by the petitioner. It should be remembered that the March, 1968 term of the Danville court was the first term which the jury list prepared by the commissioners, which is in question in this case, was used. Previous jury lists, used at the January, 1968 term of the Danville court and prior to that time, were not prepared by these commissioners. The witness stated he had analyzed the criminal docket venires for the months of February, 1967 through March, 1968 as to their racial composition, which is tabulated here:

March, 1967: 46 Veniremen; 42 white; 4 non-white, or 9%.

May, 1967: 65 Veniremen; 57 white; 8 non-white, or 12%.

July, 1967: 32 Veniremen; 30 white; 2 non-white, or 6%.

September, 1967: 130 Veniremen; 118 white; 22 non-white, or 15%.

November, 1967: 123 Veniremen; 114 white; 9 non-white, or 8%.

January, 1968: 69 Veniremen; 57 white; 12 non-white, or 17%.

*At this point, the use of the jury lists prepared by commissioners, other than the one here in question, stops.* In the March, 1968 term, the one with which we are here concerned, 43 veniremen were called, of which 32 were white and 11 non-white, or 26%.

The tables which follow indicate, for all of the cases tried in Danville using the jury list in question for which information is available, the numbers and percentages of black people receiving a summons as veniremen, and serving as veniremen on the lists of twenty from which juries of twelve are impaneled in Virginia. The petitioner made no attempt to take the entire list as prepared by the jury commissioners and analyze it as to its racial makeup. The tables are prepared from the testimony of the witness and the facts stated by the petitioner in his petition for writ of error which is part of the record here.

Jurors receiving summons as veniremen during the March, May, and July, 1968 terms of court. Names drawn from the list in question.

| | March Term | May Term | July Term |
|---|---|---|---|
| White | 32 | 49 | 38 |
| Black | 11 | 6 | 12 |
| Total | 43 | 55 | 50 |
| % Black | 25.6 | 11.1 | 24.0 * |

Black people expressed as % receiving summons as veniremen for 1968 terms of court: 19.6% *

* At another place in the petition for writ of error, it was stated that 50 people were summonsed as veniremen in July, of which 10 were black, or 20%. This would change the 19.6% figure to 18.9%, and the 24.0% figure to 20.0%.

Veniremen taken from the list in question serving on lists of twenty veniremen from which juries are impaneled. 1968 terms of court.

| | March Term | May Term | July Term |
|---|---|---|---|
| White | 174 | 83 | 48 |
| Black | 46 | 17 | 12 |
| Total | 220 | 100 | 60 |
| % Black | 20.9 | 17.0 | 20.0 |

Black people expressed as % serving on lists of twenty veniremen from which juries are impaneled: 19.7%

There is no doubt that the veniremen were drawn from the jury box by the clerk at random and placed on the clerk's list in the order in which they were drawn. A summons was then issued to the sergeant to serve on each juror, and the order in which the jurors appeared on the list which the attorneys used at the trial of the case was in the order

of the sergeant's return and at random. No mark or designation appeared anywhere on any list to show whether a person was white or black. The addresses of the jurors did appear on some of the lists, almost certainly on the summons the clerk gave to the sergeant. The court considers the addresses of the jurors to be of no significance, since, by looking at a person, it is nearly always obvious whether he is black or white.

The third claim of the petitioner is that his confession was Constitutionally inadmissible. Apparently, the contention is that the confession was inadmissible because it was involuntary and that it was involuntary because the defendant states that he was nervous at the time he made the confession, and, being in a strange city in a police station, surrounded by officers, should have been given an opportunity, after he started confessing, to reevaluate his situation as to having an attorney present. The petitioner cites Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); Douglas v. California, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963) reh. den., 373 U.S. 905, 83 S.Ct. 1288, 10 L.Ed.2d 200 (1963); and Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964). *Gideon* and *Douglas* have little bearing on the case, except as they pertain to the general right of appointment of counsel. *Escobedo*, of course, as expanded by *Miranda*, does.

The detective who questioned Hope gave Hope, verbally, a complete *Miranda* warning at the scene of the crime when he was put into the police car, and Hope, an educated man with a master's degree, read and signed a *Miranda* warning, in writing, before he made the statement which is complained of. It is quite true that Hope must have been nervous. Almost anyone would be nervous after he had robbed a bank at gun point and had been run down in an automobile chase and arrested. But, such nervousness does not rob the confession of its voluntary character. In his testimony before this court, Hope quite candidly admitted that nobody threatened him into signing the confession and nobody promised him anything if he signed it. At no place in his own testimony did he claim that he was frightened into signing the statement or so nervous that he did not know what he was doing. The detective described him as nervous, and he described himself as scared, but no combination of circumstances revealed by the record would go to show that the confession was anything but perfectly voluntary. The requirements of *Miranda* were scrupulously complied with, and the court is of opinion that the contention that the confession was improperly admitted into evidence is without merit.

Claims 1 and 3, taken together, really present the serious side of Hope's petition. They are that the jury which tried him was impaneled from a venire in the makeup of which black people were discriminated against on account of their race. He also claims that he had a right to have black people on the panel which tried him, and that, erroneously excusing a black venireman, the trial court made it possible for the Commonwealth's Attorney to strike all of the black people from the venire by means of peremptory challenges.

It is the opinion of the court that none of these contentions are well taken for the reasons which will follow.

In the first place, and most importantly, there is not any merit to the contention that the venire from which the panel which tried Hope was chosen was made up in any way discriminatory against black people. Granted that the juries in Danville from 1960 through 1967 would be suspect under the rule of Stephens v. Cox, 449 F.2d 657 (4th Cir. 1971), which rule is to the effect that if a substantial disparity exists between the proportion of presumptively qualified Negroes of the general population and their proportion on juries, a prima facie case of racial discrimination will be made if the disparity is coupled with additional positive indicia of discrimination or

with a showing that the selection procedure provides an opportunity for discrimination. Here, there is no substantial disparity between the proportion of the qualified Negroes in the general population and their proportion on the jury venires in Danville commencing with the March, 1968 term. The fact that there may have been a disparity prior to the March, 1968 term should not, and must not, be allowed to taint future juries, unless some evidence is produced from which an inference of discrimination may be taken. It has been shown that the black population of Danville available for jury duty is not more than 22%. The venire from which the panel which tried Hope was chosen was 25% black until one black venireman was disqualified for cause, and after that was 20% black. The evidence as to all of the veniremen serving on the lists of twenty at the March, 1968 term of the Danville court shows that they were 20.9% black, and that of all of the veniremen serving on the lists of twenty called during and after the March 1968 term of the Danville court, 19.7% were black. Compare this with a black population in the general public of 20.0% for those 25 years of age and over, and only slightly more for those 21 years and over, and we see that the veniremen serving on the lists of twenty in the Danville court for the March, 1968 and subsequent terms was 2.3%, at the most, and 9/10 of 1%, at the least, at variance with what would have been the mathematical precision of a random selection from a list of the census, which does not exist in available form for jury commissioners.[2] Since the venires were drawn at random from the list made up by the jury commissioners, and since the veniremen were either drawn at random from those summonsed or were taken at the top or bottom of the list, it is quite apparent that the jury commissioners had done their job conscientiously and well, without any discrimination against black

people being placed on the jury list. In addition, not any evidence has been offered which is any positive indicia of discrimination or a showing that the selection procedure provides an opportunity for discrimination. It is quite true that had the veniremen shown a disparity to the extent shown in *Stephens*, the finding of the court might be different. Preparing jury lists by race with mathematical precision is not required by the Constitution, Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), reh. den. 381 U.S. 921, 85 S.Ct. 1528, 14 L.Ed.2d 442 (1965), and indeed it seems to the writer that including members of any race because of their race, in proportion to their numbers, is just as discriminatory as their exclusion. While it is true that random selection will undoubtedly end up with a proportionate number of people of all races and segments of the community, it is not required in preparing jury lists, and, indeed, absent a list of the population as a whole, it is hard to see how true random selection could be achieved. If the veniremen are any example of the effectiveness of the jury commissioners' work, and they must be because they are the people who sit in judgment on their peers, the jury commissioners, in the case here presented, did their work just about as well as they could absent a deliberate mathematical inclusion of somewhere between 20.0% and 22.4% black people in the preparation of the jury list.

The figure of 19.7% of veniremen serving on the lists of twenty coming from the jury list prepared by the jury commissioners here involved is so near to mathematical precision that it is the opinion of the court that it should not be disturbed, and no presumption of discrimination should arise from this small difference, absent some kind of positive evidence indicating discrimination or opportunity for discrimination. See United States v. DiTommaso, 405 F.2d 385

2. If the figures used for comparison are from all those veniremen receiving a summons the result is of no substantial dif-

ference. The same can be said if the figures used for comparison are only those for the March term of the court.

(4th Cir. 1968). No such evidence has been here presented. In fact, quite the contrary appears. It is apparent from the record that there has been a conscientious effort by the jury commissioners in the City of Danville to rid themselves of the taint of the discriminatory aspects of the jury lists as prepared by the commissioners in 1967 and in previous years, and such effort does not deserve the condemnation of the court.

The balance of petitioner's contentions will be next considered.

■ The claim that petitioner was entitled to have members of his race on the panel which tried him has been answered in the negative in the cases of *Swain,* supra, and United States v. Canty, 422 F.2d 358 (4th Cir. 1970).

■ Although there is no right to have a particular person on a jury, so that borderline objections to the disqualification of jurors for cause should always be resolved in favor of the disqualification, Wright v. Commonwealth, 73 Va. (32 Gratt.) 941 (1879), the testimony quoted above in the colloquy between the trial judge and the black venireman who was excused for cause shows that the venireman should have been excused because he was not indifferent in the cause, a phrase included in the Virginia statute, Va.Code Ann. § 8–199, which is at least as old as Lord Coke.

■ Speaking quite technically and really quite properly, because the petitioner was represented at each stage of this proceeding by able, experienced counsel, all of petitioner's contentions concerning the racial makeup of the jury venire, as contrasted to the panel, should not have been heard here because they were not heard in the trial court, and the Supreme Court of Appeals had no record on which to act in considering the contentions set out in petitioner's petition for a writ of error.

There was no doubt that race was on the defense attorney's mind from the beginning of the trial, and it was also on the mind of the defendant. The defend-

ant quite candidly admits it, and the trial had not proceeded more than a few minutes before the subject was raised by the defense attorney. The record further shows that the trial judge afforded the defendant opportunity for consultation in chambers concerning the racial matter which was raised, as well as the matter of the admissibility of the confession, and it cannot be said that the trial judge presented the defendant with the grisly choice of making racial objections as to the makeup of the jury in the presence of the jury or of not making them at all.

■ The court is aware of the rule of McNeil v. North Carolina, 368 F.2d 313 (4th Cir. 1966), which states that a waiver in a case such as this must be an intentional relinquishment or abandonment of a known right or privilege. Such was the case here. The attorney knew of the right, and the defendant knew of the right, and they waived it. They accepted the twenty veniremen without objection from which the panel was chosen and did not object until after the panel was chosen. The objection then only went to the fact that no black people were included on the panel, and did not go to the makeup of the venire. The reason for the failure of the defendant to raise the question of the venire is quite obvious. There were fifteen white people and five black people on the original list of twenty veniremen (sixteen and four after the excuse for cause), and black people were represented on the venire in proportion to the percentage of their representation in the population of Danville available for jury service. No opportunity was given to the trial judge to pass on the racial composition of the venire, and no evidence was taken concerning it. The motion of the defendant to set aside the verdict did not state anything about race, and nowhere during the trial was any racial issue raised except as to the fact that the defendant was denied the right to have at least one black person on the panel by reason of the exclusion for cause of the black venireman.

The court does not base its opinion on waiver, but waiver in this case is just as valid a defense to the question of the makeup of the jury venire as are the facts. Both are overwhelmingly against the position of the petitioner.

■ An order is this day entered dismissing claims 1, 2, and 3 of the petition on their merits, and dismissing claim 4, without prejudice, for failure to exhaust state remedies under 28 U.S.C. § 2254.[3]

This 30th day of March, 1972.

---

3. A question as to an overheard conversation between two jurors was not mentioned in the state court proceeding and was not mentioned in any of the pleadings here. It was brought up only during the *ore tenus* hearing in this court, and the court advised the petitioner at the time that it would not be heard because of failure to exhaust state remedies. 28 U.S.C. § 2254.