King **HAIRSTON**, Appellant,

v.

**J. D. COX**, Superintendent, Virginia State Penitentiary, Appellee.

No. 14768.

United States Court of Appeals, Fourth Circuit.

Argued March 5, 1972.

Decided May 18, 1972.

Daniel H. Pollitt, Chapel Hill, N. C. (Court-appointed counsel), for appellant.

Robert E. Shepherd, Jr., Asst. Atty. Gen., Va. (Andrew P. Miller, Atty. Gen., Virginia, on brief), for appellee.

Before BRYAN, WINTER and CRAVEN, Circuit Judges.

WINTER, Circuit Judge:

In this appeal by a Negro state prisoner who sought a federal writ of habeas corpus on the ground of systematic

exclusion of Negroes from the grand jury which indicted him and the petit jury which tried and convicted him, we think that petitioner established a prima facie case. Accordingly, we reverse the order denying the writ and remand the case for an evidentiary hearing to afford the State the opportunity to offer rebuttal evidence. If the prima facie case is not successfully overcome, the writ should issue.

## I

Petitioner, King Hairston, was convicted of first degree murder in the Henry County, Virginia, Circuit Court on April 8, 1942. He was sentenced to life imprisonment. He did not appeal, but he sought habeas corpus relief in that court in November, 1967. After a hearing held in September, 1968, the petition was dismissed; and its dismissal was upheld by the Virginia Supreme Court of Appeals in April, 1969. He then filed a habeas corpus petition in the district court in September, 1969, and another in February, 1970. These were considered together and, as interpreted by the district court (with which we agree), they raised these issues: "(1) Systematic exclusion of Negroes from the grand and petit jury; (2) a warrantless arrest; (3) an improper preliminary hearing; (4) no indictment in the present record; (5) an improper jury verdict; and ineffective representation of counsel."

The district court dismissed the petitions on the basis of the evidence adduced at the state court hearing and the state court's findings of fact. With respect to the issue of systematic exclusion, the district court found that petitioner had not proved a prima facie case, thus making an evidentiary presentation by the state unnecessary. Since we agree with the disposition of all issues save systematic exclusion, we will confine our discussion to it.

## II

By the 1936 Virginia code provisions, which governed criminal jury selection in 1942, forty-eight grand jurors were selected by the circuit court judge to serve twelve months. From these, the clerk would choose five to seven persons for service during each court term. Va.Code Ann. § 4852 (1936). Aside from "male citizens . . . twenty-one years of age," the only criteria guiding the judge's choice were that the persons be "of honesty, intelligence, and good demeanor, and suitable in all respects." Va.Code Ann. § 4852 (1936).

Petit jurors were chosen by a three-member jury commission (appointed each year by the circuit judge) which submitted one to three hundred names from which the clerk would draw, from a closed box before witnesses, twenty-four names for use at a term of court. Va.Code Ann. §§ 4895, 5986, 5988 and 5992 (1936). The commissioners were only bound to choose male resident citizens who were twenty-one years old; Va.Code Ann. § 5984 (1936); and "well qualified." Va.Code Ann. § 5988 (1936). In Henry County the master lists were destroyed and redrawn each year so that the 1942 list is unavailable.

At the state habeas corpus hearing, the state judge found that there were no Negroes on either the grand jury which indicted Hairston or on the petit jury which convicted him. Approximately one-fifth of Henry County was non-white. The present circuit court clerk, who was deputy clerk in 1942, testified that the jury commissioners, who were all white, used voting lists (sometimes referred to as the tax lists), containing racial designations, and telephone directories for their sources of jurors. The state judge concluded that the tax lists were extensively used in the past. In making their selections, the judge and commissioners relied on reputation information acquired from their own knowledge and from the knowledge of potential jurors' neighbors. On the testimony of the clerk, a former Commonwealth's attorney, and one of petitioner's counsel at trial, the state judge found that after 1935, Negroes were included on jury lists. It is true that there was

testimony that, after the decision in Norris v. Alabama, 294 U.S. 587, 55 S. Ct. 579, 79 L.Ed. 1074 (1935), the presiding judge directed that Negroes be included on juries in Henry County, or at least that they not be excluded, and the direction was obeyed. But, it is significant that most of the witnesses could remember only a single celebrated case, tried in 1944, in which any Negroes actually served, and another witness, whose recollection was more general, rather clearly indicated that Negro representation on juries was token in character.

### III

Since Neal v. Delaware, 103 U.S. 370, 26 L.Ed. 567 (1881), federal courts have allowed Negroes complaining of indictment or conviction by juries from which members of that race were systematically excluded to rely upon circumstantial factors tending to show discriminatory practices in order to obtain relief, rather than to require direct proof of discrimination. Cf. Norris v. Alabama, 294 U.S. 587, 593, 55 S.Ct. 579, 79 L.Ed. 1074 (1935). "[S]ome particular act of discrimination by some particular officer responsible for the selection of the jury" need not be shown to constitute a prima facie case and to place the burden on the state to disprove discriminatory practices. Avery v. Georgia, 345 U.S. 559, 562, 73 S.Ct. 891, 893, 97 L.Ed. 1244 (1953).

In Witcher v. Peyton, 405 F.2d 725 (4 Cir. 1969), we relied on several factors, short of direct proof to conclude that there had been purposeful exclusion of Negroes from the grand and petit juries. First, the judge and the jury commissioners who were white selected jurors from among the "best people" known to them. We believed this practice tended to exclude Negroes because of the limited social and commercial intercourse between the races. Second, we found that records from which the names of potential jurors were taken were maintained on a segregated basis. We felt that this presented " 'the oppor-

tunity for discrimination . . . .' Whitus v. Georgia, 385 U.S. 545, 552, 87 S.Ct. 643, 647, 17 L.Ed.2d 599 (1967)." 405 F.2d at 729. Finally, we found that Negroes were consistently underrepresented on both grand and petit juries. In our opinion, "[d]isproportionate representation [which] was recurrent, systematic and relatively uniform in degree," 405 F.2d at 728, provided objective evidence of discrimination. 405 F. 2d at 727–729.

In the later decision of Stephens v. Cox, 449 F.2d 657 (4 Cir. 1971), we concluded that there was sufficient proof to establish a prima facie case of systematic exclusion so to require the state to show that a disproportion between the ratios of Negro population and Negro grand and petit jurors resulted from benign and nondiscriminatory factors. There, what was proved was the fact of the imbalance and the opportunity for discrimination under substantially the same statutes and procedures as were followed in the selection of Hairston's juries. In Stephens the disparity between adult Negroes and their representation on juries was proved to be approximately 2–1. In the instant case, on the present record, the disparity is inferrably far greater. Stephens, therefore, decided that a prima facie case has been established here and the state must establish that there was not an actual disparity or that there are lawful circumstances to explain whatever disparity existed.

█ In this case, the factors present in Witcher are also present. Despite testimony that Negro jurors were selected as early as 1935, no one recalled seeing a Negro actually serve until 1944. The witnesses who testified in this regard were the clerk, the Commonwealth's attorney in 1942, a deputy sheriff and one of the attorneys who represented Hairston in 1942, and who had practiced law in Henry County since 1932. All of the witnesses had, thus, spent their professional lives as observers and integral parts of the Henry County court system. Their non-recol-

lection is of great weight since the presence of Negroes on juries in the late thirties and early forties would certainly have been an event of note, given the then condition of race relations. In *Norris v. Alabama*, 294 U.S. at 591, 55 S.Ct. at 581, it was held that the testimony of jury commissioners, court clerks, and persons who had lived their entire lives in the county in question that they "had never known of a negro *serving*" (emphasis added) on a grand or petit jury established a prima facie case. There is little difference between the testimony in *Norris* and that of the witnesses here who could not recall that a black ever *served* on either jury, except for one case in 1944.

As in *Witcher*, there was, in the instant case, an all-white jury commission and state judge who chose jurors on the basis of their subjectively evaluated reputations. The permissive statutory selection criteria of "well qualified" and "honesty, intelligence, and good demeanor, and suitable in all respects" deferred judgment entirely to the selecting agent's preconceived notion of indices of these traits. "It is a simple truth of human nature that we usually find the 'best' people in our own image, including, unfortunately, our own pigmentation." 405 F.2d at 727. But in any event, "in a society that is still largely segregated, at least socially, it is obviously true that white people do not generally have the wide acquaintance among Negroes that they have among other white people. A failure of either the judge or the commissioners fully to acquaint theselves with all those eligible for jury duty can just as effectively result in racial discrimination as would conscious and deliberate invidious selection." 405 F.2d at 727.

Finally, and most significantly, the clerk of the court testified that the tax paid list from which the initial selections were made was maintained on a segregated basis. This is a critical factor since it was a "component part" of the selection mechanism and gave "op-portunities to discriminate, as experience tells us there will inevitably be when such differentiating [lists] are used." *Avery v. Georgia*, 345 U.S. at 564, 73 S.Ct. at 893 (Frankfurter, J., concurring). Sources of names that racially identified prospective jurors were the most impermissible elements of the selection devices condemned in *Whitus*, *Avery* and *Witcher*. It is a reasonable conclusion to draw from the paucity of black jurors shown here that available opportunities for racial exclusion were utilized. The compilation of a major source of names on the basis of racial identity, thus permitting discriminatory selections at the master list stage, could render ineffectual the safeguards created by the drawing of petit jurors. See Va.Code Ann. § 5992 (1936).

Thus, applying federal constitutional standards to the facts demonstrated by the evidence in the state habeas corpus hearing, Hairston has stated a prima facie case under the rationale of *Stephens* and *Witcher*. See also, Hamilton v. Watkins, 436 F.2d 1323 (5 Cir. 1970).

The correctness of our conclusion that, on the authority of *Witcher* and *Stephens*, Hairston established a prima facie case of systematic exclusion is confirmed by the Supreme Court's recent decision in Alexander v. Louisiana, 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (April 3, 1972), rendered not only subsequent to argument of this appeal but also subsequent to the preparation of an earlier draft of this opinion. In *Alexander*, petitioner, a Negro convicted of rape, attacked the validity of his conviction, *inter alia*, on the ground of invidious racial discrimination in the selection of the grand jury which indicted him. The evidence showed that Lafayette Parish where he was tried had a Negro population of 21%. Petitioner's grand jury venire included one Negro, and the grand jury which indicted him none. Grand jurors were selected as follows: Jury questionnaires were sent to persons on a list compiled from nonracial sources by an all-white jury commission, but the

questionnaires included a space for racial designation. Approximately 14% of the questionnaires returned were from Negroes. To each returned questionnaire, the jury commissioners attached an information card showing, among other data, race. The commissioners then undertook to eliminate questionnaires of those persons not qualified for jury service or exempted by state law. The approximately 2,000 remaining questionnaires were placed on a table from which 400 were selected, purportedly at random. These were placed in a box and 20 were drawn to constitute the grand jury venire.

From these facts, the Court held that petitioner had made out a prima facie case of invidious racial discrimination, thus casting upon the State the burden of explaining how, from benign, nonracial considerations, there was a disproportionately low number of Negroes throughout the selection process. The Court held that petitioner's case was proved by (a) the striking decimation of Negro jurors at the end of the selection process and (b) the fact that the selection process was not racially neutral. These factual conclusions were arrived at notwithstanding that there was testimony, unquestioned by the court, that race was not a consideration in the selection process. Rather, the Court thought that proof of the opportunity for discrimination and the result proved discrimination in fact.

Both operative facts relied on in *Alexander* to invalidate the conviction are found in the present record. Hairston had no Negro jurors, grand or petit, in an area where the Negro population was 20%. Even in the light most favorable to the State, the present evidence shows that Negroes had been underrepresented—if not unrepresented—on grand and petit juries for years. Additionally, the major source of potential jurors, as the state court found, was lists which carried racial designations. Thus, there is the congruence of opportunity for sys-

tematic exclusion and a result consistent with systematic exclusion. *Alexander*, thus, requires that Hairston be freed unless the State can rebut the prima facie case, or the State elects to retry him validly.

## IV

■■ We do not hold that Hairston is entitled to habeas corpus relief at this time. While we disagree with the legal conclusion of the state and district courts that Hairston failed to show prima facie there was systematic exclusion of Negroes from jury service at the time of his trial, the state is entitled to the opportunity to rebut or explain. Stephens v. Cox, supra. We recognize that data on the composition of jury lists in 1942 and related years is now impossible to obtain. Nonetheless, it appears that the actual panels which sat in specific cases are still known and an examination and analysis of these records may provide a fertile field for the state's defense if it elects to pursue them. Other persons who have some recollection of the composition of juries in 1942 may also still be available. In any event, petitioner's right to be afforded equal protection of the laws is a basic one. We agree with the Fifth Circuit which, in granting habeas relief in 1970 because of systematic exclusion from a conviction obtained in 1932, said "[d]elay alone is no bar to federal habeas relief to correct jurisdictional and constitutional trial errors." Hamilton v. Watkins, 436 F.2d at 1326.

Reversed and remanded.

ALBERT V. BRYAN, Circuit Judge (dissenting):

For 26 years appellant has withheld any challenge to the methods by which the juries were chosen that indicted and convicted him of murder in 1942. Nothing is adduced to show why the contentions he now makes could not have been

asserted then. However, it is conclusively established that this inexplicable delay obstructs, if not defeats, the ability of the State to rebut his charges. Time, through death, disappearance of witnesses and destruction of records, serves one who would fault the proceedings in which he has been convicted.

The record indicates that complete information on the composition of jury rolls at the time of Hairston's conviction is no longer existent. He does not and cannot demonstrate the racial profile of the population eligible at that time for jury service.

Rather than reveal discrimination in the drawing of Negroes as jurors, the evidence indicates that inclusion of them was essayed. Witnesses without contradiction testified that the Judge of the State Court in which Hairston was tried had explicitly directed as early as 1935 that Negroes be put on jury rolls, obeying the precept of Norris v. Alabama, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074 (1935). The mere circumstance that none served on the juries which indicted and convicted petitioner—a fact subject to a witness' suggestion that one of the petit jurors may have been a Negro— does not support the claim of systematic exclusion entitling petitioner to relief. Virginia v. Rives, 100 U.S. 313, 25 L.Ed. 667 (1879). Furthermore, witnesses testified to personal knowledge that Negroes were on the juries in 1944.

Taken together, including the protracted delay of the appellant, the facts recounted herein preclude the assertion of a denial of due process in his trial and conviction.

The decision upon which the majority now rests, Alexander v. Louisiana, 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (April 3, 1972), is not precedent here. There the objection to the selection of the grand jury was made before, *not 26 years after*, trial.

I would affirm the District Court's dismissal of the appellant's claim.