James Murray **CARRINGTON,**
Petitioner,

v.

**A. E. SLAYTON, Jr., Superintendent, Virginia State Penitentiary, Respondent.**

**Civ. A. No. 71–C–46–L.**

United States District Court,
W. D. Virginia,
Lynchburg Division.

May 31, 1973.

Charles M. L. Mangum, Lynchburg, Va., for petitioner.

Robert E. Shepherd, Jr., Asst. Atty. Gen., Richmond, Va., for respondent.

OPINION

WIDENER, Circuit Judge (Sitting by Designation as a U. S. District Judge).

Petitioner, James Murray Carrington, having exhausted his state remedies, seeks relief from this court by way of writ of habeas corpus. Petitioner, who is black, is incarcerated as a result of two jury convictions in the Circuit Court of Appomatox County, one on December 8, 1970 for rape, and the other on May

17, 1971 for abduction. He was sentenced to 35 years for rape and 40 years for abduction.

Petitioner alleges that the convictions and sentences pursuant to which he is confined were imposed in violation of the Due Process clause of the Fourteenth Amendment and the Sixth Amendment to the United States Constitution in that petitioner was tried by a jury chosen by a method which, in the past and during petitioner's trial, systematically excluded and underrepresented black persons on the jury lists.

In recent years, the law concerning discrimination by race in selection of individuals for jury service has been undergoing development. Alexander v. Louisiana, 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972); Whitus v. Georgia, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967); Avery v. Georgia, 345 U.S. 559, 73 S.Ct. 891, 97 L.Ed. 1244 (1953); Hairston v. Cox, 459 F.2d 1382 (4th Cir. 1973); Stephens v. Cox, 449 F.2d 657 (4th Cir. 1971); Witcher v. Peyton, 382 F.2d 707 (4th Cir. 1967). In Stephens, supra, the Fourth Circuit enunciated the elements necessary for a petitioner to make out a *prima facie* case for habeas corpus relief:

> "A showing that a substantial disparity exists between the proportion of presumptively qualified Negroes in the general population and their proportion on juries will establish a *prima facie* case of racial discrimination, if the disparity is coupled either with additional positive indicia of discrimination or with a showing that the selection procedure provides an 'opportunity for discrimination'. Whitus v. Georgia, 385 U.S. [545] at 552, 87 S. Ct. 643 [17 L.Ed.2d 599]; Witcher v. Peyton, [382 F.2d 707]."

*Stephens*, 449 F.2d at 659. The rule of Stephens requires that petitioner must show two things to make out a *prima facie* case: (1) a substantial numerical disparity and (2) either additional positive indicia of discrimination or an opportunity for discrimination in the selection procedure. As to substantial disparity, a disparity of approximately 2–1 existing between the proportion of adult Negroes and their representation on juries was sufficient to be deemed a "substantial disparity" in *Stephens*.

*Stephens* also discussed "additional positive indicia of discrimination." While not pretending to be an exhaustive listing, the court included the following: (1) the extent to which Negroes have served as jury commissioners; (2) whether or not names of prospective jurors were taken from racially segregated lists, (3) whether or not there have been persistent and systematic attempts to utilize peremptory challenges to eliminate Negroes from actual service at trial, and (4) whether there has been a deliberate placement of a certain number of Negroes on each jury.

The court, in *Stephens*, did not discuss the meaning of the phrase "opportunity for discrimination," but it did appear that the jury commissioners in *Stephens* (all white) could choose from the racially designated prospective jury list anybody they wanted so long as such persons were of "good repute for intelligence and honesty." Likewise, Witcher v. Peyton, 382 F.2d 707 (4th Cir. 1967), involved jury commissioners (all white) who selected prospective jurors from lists which indicated race. See also Hairston v. Cox, 459 F.2d 1382 (4th Cir. 1973). *Witcher* and *Stephens* cited Whitus v. State of Georgia, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967) on the point of opportunity to discriminate. *Whitus* involved selection of jurors by use of segregated lists. *Whitus* relied on Avery v. Georgia, 345 U.S. 559, 73 S.Ct. 891, 97 L.Ed. 1244 (1953) in which selection was by drawing cards, which were yellow if the person whose name appeared thereon was black. It would seem that any system short of random selection would present *some* opportunity, however slight, for discrimination by one bent on mischief; yet, in this circuit, random selection is not the constitutional criterion. *Stephens*, n. 8 at 449 F.2d 660.

From the cases, it seems that the question of whether there is an opportunity to discriminate must be asked initially, assuming that, if possible, the public officials in the locality in question *are* going to discriminate. See *Alexander*, supra, at 405 U.S. 631, 92 S.Ct. 1221. Given the present state of the law, this writer would surmise that there would be a more widespread acceptance of the apparently constitutionally unassailable practice of random selection from non-racially designated lists. Cf. 28 U.S.C. § 1869(c)(d).

With the foregoing in mind, the instant case must be reviewed to determine if petitioner has presented facts sufficient to make out a *prima facie* case. Of course, such facts do not entitle petitioner to relief unless the state fails to meet its burden of going forward and showing that there is, in fact, no discrimination. *Alexander*, 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536.

Petitioner Carrington raised the jury discrimination claim before the trial court and testimony was taken *ore tenus*. Petitioner and the state have stipulated that if certain of the witnesses who testified before the trial court were called to testify before this court, their testimony would be the same as it was before the trial court. The transcript of the testimony of the witnesses has been filed. Neither party called any additional witnesses, although given opportunity so to do, at the hearing held by this court.

The testimony of Aldah B. Gordon, Clerk of the Circuit Court of Appomatox County, shows that, on January 14, 1970, an order of the court was entered appointing five jury commissioners for the year 1970. One of the commissioners, Edward T. Johnson, Jr., was black. He acted as such in preparing the list of jurors for 1970, but was deceased at the time of the trial court hearing. On January 21, 1970, the clerk administered the oath of office to the commissioners, which binds them to select without prejudice persons of good repute for intelligence and honesty. The commissioners may select anyone they care to, and they were provided with a list of names from the personal property book for use as an aid. The clerk directed them to choose about 250 names. The clerk testified that she usually told commissioners to choose at least 40 to 50 from the black race, but that she couldn't recall whether or not she so told these particular commissioners. The names selected by the commissioners are placed in a box and folded twice so that one cannot tell in advance whether a white or a black is being drawn. The drawing is usually done by the Commissioner in Chancery in the presence of the clerk and another witness. The drawing for the petitioner's trial was done in the presence of the trial judge. Incidentally, petitioner's lawyer was in the clerk's office at the time, although not for the purpose of witnessing the drawing. The clerk testified that racial discrimination played no part in the selection process.

Jury commissioner Murrell Ferguson testified, and his testimony shows, that the commissioners deliberated as a group in their selection process. They used the personal property list merely as a guide and they attempted to get people from all the magisterial districts. His testimony further indicates that the black commissioner was helpful in advising on the qualifications of the black people who were considered. He testified that they all knew that each person had to be a resident of the State of Virginia for a year, 21 years of age, and a resident of Appomatox County for six months prior to serving on the jury, besides being of good repute for intelligence and honesty. Ferguson stated that they didn't intentionally pick or exclude anyone on account of race. The testimony of the other commissioners was to the same effect. They denied that race had anything to do with their deliberation, and that basically they tried to pick good citizens. One commissioner, Smith, stated very emphatically that Johnson, the black commissioner, was relied upon to strike blacks from the list on the basis of his knowledge. It further appears

that there was no racial designation on the personal property list, and the list was not the exclusive source of prospective jurors.

The stipulation entered into in this case shows that in 1970 the population of Appomatox County totaled 9,784 persons with 7,354 being white and 2,426 being black, with blacks thus constituting 24.8% of the population. Of the 9,784 total, 5,332 are between the ages of 21 and 69. The 5,332 figure is further broken down as follows: 4,185 white, 1,147 black, or 21.5% black. The jury commissioners, 5 in number, contained one black and was thus 20% black. The grand jury which indicted petitioner on both counts was 33.3% black. The master jury list for 1970 from which both of petitioner's juries were drawn consisted of 199 names, of whom 176 were white and 23 were black—a percentage of 11.55 black. The jury which tried petitioner at his first trial was selected from a venire which contained 36 names, two of which were black—a percentage of 5.5. The list of 20 from which the jury was impaneled has 2 blacks, a percentage of 10. The jury which tried petitioner at his second trial was selected from a venire which contained 40 names, of whom 3 were black for a percentage of 7.5 black. The list of 20 from which the second jury was impaneled contained 1 black, a percentage of 5.

This court appointed the attorneys in this case as special masters and directed them to conduct a random selection from the 1969 personal property tax book. The selection resulted in a black percentage of 16.79.

These figures show that the percentage of presumptively qualified blacks is 21.5. The master jury list prepared by the jury commission was 11.5% black. Thus, the disparity here is about the same as shown in *Stephens*—2–1, although it is only 5.29% away from the random selection conducted by the special masters in this case and stipulated to represent a typical random selection from the personal property list. Never-

theless, since the disparity is there, the other elements must be considered.

Whether or not there was an opportunity to discriminate is the troublesome matter in this case. While not objected to, the method of selection of jurors from the master list as compiled is free from constitutional objection for it is done on a completely random basis: the name tags are folded twice and drawn from a box in the presence of witnesses. The only opportunity which is of concern would be that of the five jury commissioners to discriminate when they gather to select the jury list for the coming year of about 250 persons. While the opportunity to discriminate in this case is not equivalent to that presented in *Stephens, Whitus, Witcher, Hairston,* and *Alexander,* supra, the court cannot say that the *possibility* did not exist in this case, for every event controlled by bility of discrimination. Whether or not the commissioners did discriminate will human discretion is open to the possibe discussed subsequently, but to give the petitioner the benefit of the doubt, the court will assume for purpose of argument that, in accord with *Stephens,* he has made out a *prima facie* case.

■ Had the opportunity to discriminate been lacking, the court would have had to focus on the alternative ground of additional evidence of discrimination. While not indispensable in all instances to make out a *prima facie* case, consideration of those elements is highly relevant in that they bear on the existence of actual discrimination. The court notes first the grand jury which indicted petitioner was 33.3% black. Petitioner's juries were selected from a master jury list prepared by a jury commission which was 20% black. This is only 1.5% less than the percentage of presumptively qualified blacks in Appomatox County, and is as mathematically precise as possible. The names of prospective jurors in this case were not taken from segregated or racially designated lists. There was neither an allegation nor a showing of any attempt to use peremptory chal-

lenges to consistently exclude blacks from jury service. There was no allegation or showing that there has been any attempt to place a token number of blacks on each jury. Whether the absence of additional indicia of discrimination goes to the weakness of petitioner's case or the strength of the state's defense, the point is that the existence of these latter factors, found pernicious in *Witcher*, are totally lacking here. Cf. *Hairston*, supra.

The record in this case, which is as full as either party wanted it to be, suggests as much as anything else that the "opportunity for discrimination" was not exercised. Under the particular facts of this case, what is actually present is a remote opportunity for discrimination with a rather convincing showing that it was not exercised. Perhaps it would have been better to state at the outset that no opportunity to discriminate existed at all. There is a very fine and almost artificial distinction between the absence of opportunity and opportunity present but realistically not utilized. Nevertheless, the court cannot say that the existence of the opportunity was beyond the realm of possibility. The white members of the jury commission *could* have outvoted the black member at every turn; they *could* have contrived to prevent blacks from being put on the master list. But, not only is there no proof that they did so, the evidence is that they did not. As previously stated, the black member of the commission was more familiar with the black community and he did most, if not all, of the elimination of blacks. In fact, there being no racial designation on the list, it would have been difficult to discriminate without it being painfully obvious, especially to the black member of the commission.

To grant relief in this case, the court would have to presume that all of the commissioners acted in bad faith and in violation of their oath. Four of the commissioners took the stand and stated that race played no part in their selection. As previously stated, the fifth member was dead. The court is aware that this alone is insufficient to rebut a *prima facie* case. See *Whitus*, 385 U.S. at 551, 87 S.Ct. 643. However, several factors are pertinent here. These men were cross-examined and in no way impeached. If anything stands out from their testimony, it is that they made a good faith attempt to choose good citizens for jury duty and that the black commissioner's familiarity with the black community was helpful, not to call attention to who was black or white, but because he was more familiar with that segment of the community. Additionally, in *Whitus*, the disparity was around 4–1, a racially designated list was used, and there were no black commissioners. In fact, no State case in which relief was granted has reached the Fourth Circuit or the Supreme Court in which the facts were as innocuous as those present here.

Whether or not petitioner has made out a *prima facie* case (if he has it would necessarily be established by the lowest acceptable quantum of proof), the court is of opinion the record discloses that the commissioners did not resort to racial discrimination, nor did their procedure result in the systematic exclusion of Negroes from the jury list for the coming year. The naked percentage figures of black to white in this case are quite similar to (or less aggravated than) those present in United States v. Grant, 475 F.2d 581, 471 F.2d 648 (4th Cir. 1973) (dissent to order denying rehearing).