WILLIAM THOMAS PUGH

*v.*

BOBBY LEVERETTE, *Warden,*

WEST VIRGINIA PENITENTIARY

(No. 15366)

Decided January 28, 1982.

*Paul S. Detch*, for appellant.

*Chauncey H. Browning*, Attorney General *and S. Clark Woodroe*, Assistant Attorney General, for appellee

McGRAW, JUSTICE:

William Thomas Pugh was convicted, upon a plea of guilty entered May 5, 1964, of the crime of rape and was sentenced by the Circuit Court of Greenbrier County to life imprisonment. He appeals from a decision of that court, entered February 17, 1981, which denied him a writ of habeas corpus by which he sought to have his conviction set aside and to be discharged from custody. Pugh contends that his conviction is void in that the guilty plea upon which it was based was not made voluntarily, knowingly and intelligently.

On March 25, 1964, at approximately 8:15 a.m., Pugh, a black male, age 24, was taken into custody by officers of the Department of Public Safety in connection with their investigation of the armed robbery and rape of a white female that had occurred earlier that morning in White Sulphur Springs. According to the state trooper who conducted the investigation, Pugh was arrested on the basis of a vague description given him by the near-hysterical victim as to the height and clothing of her assailant. Pugh, a resident of Pittsburgh, Pennsylvania, was visiting his father's home in White Sulphur Springs at the time. At the habeas corpus proceeding he testified that the officers asked him several questions at his father's home and then asked him to accompany them to the county jail at Lewisburg for further questioning. Pugh complied and was transported to and lodged in the Greenbrier County Jail at approximately 8:47 a.m. Shortly after his arrival, Pugh was asked to remove his clothing and was given a pair of pants and slippers to wear. He was interrogated several times during the day and asked to sign a statement confessing to the rape. No attorney was present during these interrogations. Pugh further claims that the interrogating officer struck him, threatened him and told him he would not be permitted to call his wife until he signed the statement. The state trooper was conducted the interrogation refutes the latter allegations. At 2:20 p.m., Pugh signed a statement admitting that he committed the rape.

Throughout the day of March 25, 1964, testimony shows that the sheriff's department received phone calls threatening Pugh and advising that he be moved to another location. The state trooper and the deputies testified that these threats were supported by rumors "on the street" and by the fact that the community was highly incensed by the crime. The authorities feared that someone would attempt to break into the jail to "get" Pugh. In the late afternoon the decision was made to move Pugh for his own safety. Pugh was awakened in his cell and told to dress. The deputy told him this was for his own safety and that he had better get moving or he would have a

"permanent sleep." All of the deputies who testified stated that Pugh was aware of danger to his safety and had reason to fear for his life, as they themselves did, even though he had not been told of any direct threats made against him.

Pugh was then taken before a justice of the peace who had been called from his office to the jail to conduct a hearing. At this time Pugh had still not spoken to an attorney or to his family. The justice of the peace testified that he informed Pugh of his right to an attorney and to consult with his family, but could not recall if Pugh had voluntarily waived those rights. He indicated that Pugh may not have said anything during the hearing. The transcript of the proceeding signed by the justice of the peace indicated that Pugh had waived his right to a preliminary hearing and that he was bound over, without bond, to the next term of court. Pugh was then placed in a police car with two state troopers and was transported to the Raleigh County Jail in Beckley. Two deputies followed in an unmarked car in the event someone would try to stop the police car. At some point during the trip Pugh was made to lie down in the back seat of the car so that he couldn't be seen from outside the vehicle.

At the Raleigh County Jail, Pugh was placed in an 8 × 10 foot isolation cell normally used to segregate sick prisoners from other inmates. He testified that the cell contained a steel bed with no mattress and that the cell was provided with a sink and toilet which were operated by the jailer from outisde the cell. Pugh testified that he was fed only once or twice a day and that he was denied a shower, soap, towels and a razor during his stay at the jail. This is supported by the testimony of a Greenbrier County deputy sheriff who stated that when Pugh was returned to Lewisburg for arraignment he was dirty, appeared that he hadn't had a bath and had whiskers about an inch long. Pugh also testified that he was given no other clothing than the pants and slippers he was provided with at the Greenbrier County Jail, although deputies testified that Pugh left the jail wearing shoes and a shirt as well.

During his stay at the Raleigh County Jail, Pugh's brother and wife attempted to visit him but were told that he was not being held there. After they left the jail they saw Pugh standing at a window, talked with him briefly and attempted again to see him, but were again told that he was not being held at the jail. Pugh's brother testified that approximately two weeks later he again attempted to visit Pugh at the Raleigh County Jail and was again told that he was not there. The records of the Raleigh County Sheriff's Department show the incarceration of one William Pugh, a white male, during March 1964, but show no record of Pugh's incarceration.

On April 20, 1964, Pugh was returned to the Greenbrier County Jail for arraignment. On April 23, 1964, Pugh pled not guilty to charges of armed robbery, kidnapping, malicious wounding and rape. The orders of the circuit judge indicate that Pugh appeared in person and by counsel, but Pugh denies that he conferred with counsel and testified that he did not recall the arraignment. During this time Pugh's wife came to the jail with a preacher and was allowed to speak to Pugh for about five minutes. She indicated that she would get him an attorney and left. Pugh was returned to Beckley on April 23, 1964.

On May 4, 1964, Pugh was transported back to the Greenbrier County Jail. On May 5, 1964, Pugh consulted with his court-appointed attorneys, one of whom he testified informed him that he had no defense, that he should plead guilty to the rape charge and that if he didn't he would go to the electric chair. Pugh stated that this consulation was his first with a lawyer, that it lasted only a few minutes and that he was told that if he pled guilty he would be sentenced to a term of only ten years. Pugh was then taken before the circuit judge and asked permission to withdraw his plea of not guilty and enter a plea of guilty to the rape charge. The judge accepted the plea and sentenced Pugh to life imprisonment. After the proceedings Pugh was overheard by a deputy to complain to his lawyer that he had been told he would only receive a ten-year sentence. The lawyer replied that he had told

Pugh only that he would be eligible for parole in ten years. The next day Pugh was transported to the State Penitentiary without having ever informed his family of the entry of the guilty plea. The other charges apparently were dropped.

No record was made of the arraignment proceedings or the taking of the plea. The circuit court judge testified by deposition that he had no recollection of the proceedings held on May 5, 1964, but that he knew he had not advised Pugh of the charges against him, of his rights with respect to the plea, of the consequences of the plea, of the penalty that might be imposed or of his right to a jury trial because it was not the practice of the court to so advise defendants tendering guilty pleas at that time. He also stated that he did not request a court reporter to record the proceedings and made no inquiry into whether Pugh had intelligently entered his plea with an understanding and appreciation of the consequences because it was not required at that time and was not the procedure of the court. The prosecuting attorney had no recollection of the tender of the guilty plea or of the alleged plea bargain. One of the court-appointed defense attorneys died long before the filing of the petition for a writ of habeas corpus and the other had no memory of being assigned to the case or records to indicate his involvement.

On July 19, 1977, Pugh filed a petition for a writ of habeas corpus with this Court. On October 17, 1977 a rule to show cause was issued, returnable in the Circuit Court of Greenbrier County on November 18, 1977. Evidentiary hearings were held on December 16, 1977, and January 30, 1978. On November 18, 1980, counsel for Pugh filed a petition for a writ of mandamus to compel the circuit court to issue a decision on the matter. Before arguments could be had on the petition, the circuit court, on February 17, 1981, entered a memorandum order which denied the post-conviction relief sought by Pugh, but which modified the original sentence to life imprisonment with mercy so that Pugh would become eligible for parole. The circuit court conceded that under present law Pugh's

conviction would have fallen for failure to make a record of the proceedings but refused to apply that law retroactively. The court also concluded that the record was insufficient to warrant vacation of the conviction on the ground that the guilty plea was the result of threat or coercion and that Pugh had waived his right to complain by virtue of the thirteen-year delay between the conviction and the filing of the petition in this case.

Pugh appealed the decision of the circuit court to this Court, alleging ten assignments of error:

1. The court erred in ruling that the law at the time of the tender of Pugh's guilty plea did not require a record to be made.

2. The court erred in ruling that the absence of a record where threats of violence had been made against Pugh prior to his plea did not go to the truth-finding function of the court.

3. The court erred in ruling that Pugh was not acting under the influence of threats of violence previously made when he entered his guilty plea.

4. The court erred in limiting its inquiry only to the record made in 1964 to decide whether Pugh was coerced into making a plea, whether there were threats, wherther Pugh had adequate assistance of counsel, and whether the plea was knowingly and intelligently made.

5. The court erred in ruling that the record indicates that Pugh did have an effective assistance of counsel.

6. The court erred in ruling that Pugh knowingly and intelligently entered a plea of guilty on May 5, 1964.

7. The court erred in ruling that Pugh did not enter his plea on May 5, 1964, out of threat or fear of mob violence and of a promise to be permitted to make a plea of a lesser offense.

8. The court erred in ruling that the plea of guilty was not induced by a prior coerced confession.

9. The court erred in not declaring the original plea void and granting Pugh a new trial.

10. The court erred in ruling that the plea of guilty was voidable only and that the passage of time created an estoppel to asserting Pugh's claim.

The essence of Pugh's argument is that the tender of the guilty plea was not voluntary, knowing and intelligent, that the failure to make a record of the proceedings was a fatal error and that Pugh did not waive his right to assert these defects by virtue of his delay in seeking post-conviction relief. It is uncontested that by today's standards for the acceptance of guilty pleas, Pugh's conviction would be void. *Call v. McKenzie*, 159 W.Va. 191, 220 S.E.2d 665 (1975). Pugh contends, however, that West Virginia law at the time of this conviction required the trial court to ascertain the voluntariness of his plea and to make a record of the proceedings and that, therefore, his conviction was void at that time. The State argues that Pugh's guilty plea was taken in conformity with the legal standards of the day and that the voluntariness of the plea should be presumed in the absence of a record of the proceedings.

Pugh relies on *State v. Hill*, 81 W.Va. 676, 95 S.E. 21 (1918), and *State ex rel. Burkhamer v. Adams*, 143 W.Va. 557, 103 S.E.2d 777, *cert. denied* 358 U.S. 869, 79 S.Ct. 102, 3 L.Ed.2d 101 (1958), as support for the proposition that the law in West Virginia in 1964 required that the defendant be advised by the trial court of his rights prior to acceptance of a guilty plea and that the court ascertain that the plea was made voluntarily by the defendant, with a full appreciation of the consequence of his actions.

In *Hill*, the defendant was indicted on a charge of murder. At his arraignment, the defendant appeared in person and by counsel and entered a plea of guilty to the charge. Three days afterwards he was brought into court for sentencing and requested that he be allowed to withdraw his plea of guilty and to enter a plea of not guilty and have a jury trial on the charge. The court denied the motion and imposed a sentence of death. The defendant appealed on the grounds that the court erred in accepting the guilty plea and in refusing to allow the defendant to withdraw the plea. With respect to the first

assignment of error, the reviewing court stated in Syllabus Point 1:

A plea of guilty of a capital crime should be accepted cautiously and not until the court has warned the prisoner and been satisfied that he has acted freely and delibertely after being so admonished and with full knowledge, appreciation, and understanding of the nature and consequences of his confession.

*See also State v. Stone*, 101 W.Va. 53, 131 S.E. 872 (1926); *Nicely v. Butcher*, 81 W.Va. 94 S.E. 147 (1917).

The Court in *Hill* also held that where these precautions have not been observed, the trial court should permit the defendant to withdraw the guilty plea. Hill's conviction was affirmed, however, on the ground that the record was silent as to the facts and circumstances surrounding the tender of the guilty plea and the reason for the defendant's motion to withdraw the plea. The Court held that "the trial court should not be burdened with the duty of making such preliminary proceedings a part of the record." 95 S.E. at 22, and that the reviewing court should assume, in the absence of a record, that the procedures for receiving a guilty plea have been complied with by the lower court.

In *Burkhamer, supra* a defendant who had pled guilty to first degree murder and had been sentenced to death, sought a writ of habeas corpus to set aside his conviction on several grounds, including an allegation that the arraignment at which his guilty plea was tendered was not properly conducted. The Court noted, however, that the trial court had advised the defendant, in almost the exact language of the indictment, of the charge against him and of each essential element of the charge. The Court further noted that the defendant and his counsel were present, that the proceedings were had in open court, that the defendant and his counsel were subjected by the lower court to extensive questioning "too voluminous to record in this opinion" before the guilty plea was accepted, that the lower court required counsel to retire

to a conference room with the defendant to confer and to make sure the defendant understood the proceedings and the consequences of his plea and that the circuit court fully advised the defendant of his right to plead guilty or not guilty, his right to have a jury trial and the consequences of a plea of guilty to first degree murder.

In denying the writ, the Court concluded that the lower court had taken every precaution to insure that the plea entered by the defendant was made voluntarily with sufficient intelligence and understanding of his rights and the consequences of his plea. The holding was stated in Syllabus Point 2 of the opinion:

> An arraignment of a defendant on an indictment charging a felony, if the plea is made in open court by the defendant in person, is sufficient where the person arraigned is identified as the person named in the indictment, is fully advised as to the charge, as to his rights relating to the plea, as to his rights of a jury trial, and of the consequences of his plea, if the defendant intelligently understands and appreciates such advice and consequences.

See also State v. Grimmer, 162 W.Va 588, 251 S.E.2d 780 (1979).

The application of these two cases to Pugh's case is obvious. The law in West Virginia in 1964 requires that a circuit court accepting a guilty plea inquire of the defendant in open court whether he understood the nature of the charge against him, his rights with reference to the making of the plea, including his rights not to plead guilty and to have a jury trial, and the consequences of his plea.

The State contends, however, that because no record was made of the entry of the plea in this case, we must assume that the lower court complied with all of the procedures for receiving the guilty plea. This principle was enuniciated in Hill, supra, and is found elsewhere in our law. The State ignores the facts and exhibits presented in this case. The record before this Court, espe-

cially the deposition of the circuit court judge who accepted Pugh's plea, quite clearly demonstrates that Pugh was not advised of his rights, of the nature of the charge or of the consequences of his plea. The circuit judge quite freely admits that it was standard procedure in his courtroom not to advise defendants of these matters.

> "We didn't have to [request the court reporter to take notes of the entry of a guilty plea]. We never did it or any of the other things you're been talking about. If a man pleaded guilty, he came in and pleaded guilty, and if he had a lawyer, that was it. It wasn't until the last few years that we had to try and talk them out of pleading guilty." (Deposition p.6).

This statement appears to be a clear admission that the trial court did not comply with the requirements for taking a guilty plea.

In addition, there is some evidence to indicate that Pugh's plea was made under oppressive and coercive circumstances. Pugh was arrested for the armed robbery and rape of a white woman in a small Southern town of which he was not a resident at a time of nationwide racial conflict. He had been removed from the Greenbrier County Jail under threat of violence and was under an apprehension of danger to his person from people in the community. He was held in the Raleigh County Jail in degrading conditions which were confirmed by the independent testimony of a deputy sheriff as to Pugh's appearance upon being returned to the Greenbrier County Jail. He was not permitted to speak with a lawyer or his family until, at the earliest, the day of the arraignment. He testified that his lawyer told him if he did not plead guilty to the rape charge he would be sentenced to death. It appears from the testimony of a deputy that he believed pleading guilty would result in the imposition of a sentence of only ten years imprisonment. Under such circumstances, there certainly exists a possibility that the plea was not entered voluntarily. Even at the time of Pugh's arrest and conviction, the

United States Supreme Court had held that a plea of guilty which was induced by promises or threats which had the result of depriving the plea of its character of a voluntary act was void and subject to habeas corpus relief. *Machibroda v. U.S.*, 368 U.S. 487, 82 S.Ct. 510, 7 L.Ed.2d 473 (1962). If the trial court here had complied with its duty to ascertain that the guilty plea was made voluntarily, "without any threat, promise or improper inducement." *Burkhamer, supra,* 143 W.Va. at 565, 103 S.E.2d at 783, perhaps the aura of coercion which envelops the guilty plea in this case would have been dispelled. As it is, the admitted failure of the circuit court to insure that Pugh's plea was made voluntarily without threats or coercion compels us to hold that his conviction was void.

We are of the opinion that the law in West Virginia at the time of Pugh's conviction required a court accepting a guilty plea (1) to advise the defendant in open court of the nature of the charge against him, of his right to a jury trial and of the consequences of a guilty plea, (2) to determine whether the defendant understood and appreciated this advise and (3) to ascertain whether the plea was entered voluntarily, without threat or coercion. The failure of the trail court to so inform the defendant before accepting the plea would have resulted in a void conviction and warrants relief in habeas corpus.[1]

---

[1] We wish to emphasize that our holding has no relation to the question of Pugh's guilt or innocence of any of the crime with which he was originally charged. Indeed, at the hearing on his habeas corpus petition, Pugh admitted, after being duly cautioned as to his rights by the circuit court, that he had participated in the armed robbery but denied that he had committed the rape. We hold only that the circumstances surrounding the court's acceptance of the guilty plea were such that Pugh's conviction is void and he is entitled to habeas corpus relief.

We further wish to emphasize that the circumstances which led to our vacation of Pugh's conviction occurred before this Court's decision in *Call v. Mckenzie,* 159 W.Va. 1912, 220 S.E.2d 665 (1975). This case should not be read as a retroactive application of *Call,* but rather as having been decided on the facts and the law as they existed in 1964.

The State contends, and the lower court found, however, that even if Pugh's conviction was void he is barred from seeking habeas corpus relief by the thirteen (13) year lapse of time between his conviction and his request for relief.[2] Although we find no West Virginia case which discusses whether a defendant waives his entitlement to collateral attack of his conviction by lapse of time, we note that our statute dealing with post-conviction habeas corpus relief specifically provides that a petition for a writ of habeas corpus may be filed at any time after the conviction and imprisonment of sentence and the expiration of time for appeal. W. Va. Code § 53-4A-1 (1981 Replacement Vol.).

Most federal courts have held that lapse of time alone does not warrant the denial of habeas corpus relief. *Pennsylvania ex rel. Herman v. Claudy*, 350 U.S. 116, 75 S.Ct. 223, 100 L.Ed. 126 (1956) (lapse of eight years); *Palmer v. Ashe*, 342 U.S. 134, 72 S.Ct. 191, 96 L.Ed. 154 (1951) (lapse of eighteen years); *Uveges v. Pennsylvania*, 335 U.S. 437, 69 S.Ct. 184, 93 L.Ed. 127 (1948) (lapse of six years); *Hawkins v. Bennett*, 423 F.2d 948 (8th Cir. 1970) (lapse of forty-four years); *Caudill v. Cowan*, 367 F.Supp. 905 (E.D. Ky. 1973) *aff'd* 500 F.2d 1402 (6th Cir.). *cert. denied* 419 U.S. 1041, 95 S.Ct. 528, 42 L.Ed.2d 317 (1974) (lapse of ten years); *Phillips v. Black*, 367 F.Supp. 774 (E.D. Ky. 1973), *aff'd* 497 F.2d 924 (6th Cir. 1974) (lapse of sixteen years). As the Court in *Pennsylvania ex rel. Herman v. Claudy, supra,* noted, "[t]he sound premise upon which these holdings rested is that men incarcerated in flagrant violation of their constitutional rights

---

[2] Pugh explains the thirteen-year delay in filing his petition by saying that he was unaware that he could file for post-conviction relief before the end of the his ten-year sentence. He thought he had to serve the ten years before anything could be done. He then asked a fellow inmate about his parole and was told he could file a writ. At that point Pugh was placed in confinement for nine or ten months for breaking institutional rule. When he was returned to the prison population, the inmate who was to help him with his writ had been transfered outside to do work for the warden. Pugh testified that other inmates were too busy to help him with his writ or wanted to be paid a sum he couldn't afford.

have a remedy." 350 U.S. at 123, 76 S.Ct. at 227. "Antiquity cannot shield such harrendous [*sic*] practice." *Hudson v. Alabama*, 493 F.2d 171, 173 (5th Cir. 1974).

Some cases hold that lapse of time increases the burden on the petitioner to overcome the presumption of the regularity of the proceedings. *Palsey v. Overholser*, 108 App.D.C. 332, 282 F.2d 494 (D.C. Cir. 1960); *Phillips v. Black, supra*; *Frost v. Montana*, 249 F. Supp. 349 (D. Mont. 1966). Even if we were to adopt this rule, however, it is clear that the petitioner here has overcome that presumption. Consequently, we conclude that grant of habeas corpus relief is not barred by the petitioner's delay in filing his petition.[3]

Pugh's final assignment of error is that the circuit court erred in holding that the trial court was not required to make a record of the proceedings at which the guilty plea was tendered. There is no question that, under present law, the failure of the trial court to make a record of the proceedings which affirmatively shows that the defendant's guilty plea is voluntary and intelligent is grounds for granting a writ of habeas corpus. *Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969); *Potter v. Mohn*, 163 W.Va. 474, 256 S.E.2d 763 (1979); *Riley v. Ziegler*, 161 W.Va. 290, 241 S.E.2d 813 (1978); *Call v. McKenzie*, 159 W.Va. 191, 220 S.E.2d 665 (1975). Pugh contends that this law should be applied retroactively to his case or, in the alternative, that West Virginia law at the time of this conviction required a record to be made.[4] In view of our

---

[3] Some jurisdictions require that the petitioner explain a substantial delay in filing for post-conviction relief. *Moreno v. Nelson*, 472 F.2d 570 (9th Cir. 1973); *Garland v. Cox*, 472 F.2d 875, (4th Cir.), *cert. denied Slayton v. Garland*, 414 U.S. 908, 94 S.Ct. 217, 38 L.Ed.2d 146 (1973); *Hairston v. Cox*, 459 F.2d 1382, (4th Cir.), *cert. denied Slayton v. Hairston*, 411 U.S. 986, 93 S.Ct. 2266, 36 L.Ed.2d 963 (1972). In California, explanation is required by statute. In the Fourth Circuit cases, the rule is apparently the result of an interpretation of the federal post-conviction habeas corpus statute. 28 U.S.C.A. § 2255.

[4] Pugh argues that the following statement in *Burkhamer, supra*, 143 W.Va. at 569, 103 S.E.2d at 785; required the court to make a record:

deposition of the other issues presented by this appeal, we are not required to reach this issue.

Consequently for the reasons stated herein, we reverse the judgment of the circuit court and award the writ here.

*Reversed;*
*writ awarded.*

---

[w]e are not, of course, intimating that no record of the arraignment need be made. An arraignment of a defendant in a criminal proceeding is an essential element of a fair trial, and its importance to the State, as well as to the defendant, makes it essential that the fact thereof be not left to memory, doubt or speculation.