**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 99-30849

WILBERT RIDEAU,

Petitioner-Appellant,

VERSUS

JOHN P. WHITLEY,

Respondent-Appellee.

Appeal from the United States District Court
for the Middle District of Louisiana

December 22, 2000

Before DAVIS, SMITH, and DENNIS, Circuit Judges.

DENNIS, Circuit Judge:

In this federal habeas corpus case, the petitioner claims that he was the victim of racial discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment, in the selection of the Louisiana grand jury that indicted him for murder.

I.

The petitioner, Wilbert Rideau, was indicted on March 1, 1961, for the capital murder of Julia Ferguson, a bank employee, on February 16, 1961, in Calcasieu Parish, Louisiana. After his armed

robbery of a bank in the city of Lake Charles, Rideau forced the victim and two other bank employees to accompany him in the victim's car to an uninhabited area outside the city. There he shot the three bank employees and stabbed the victim to death. The other two bank employees survived. State v. Rideau, 137 So. 2d 283, 286 (1962) (Rideau I).

Rideau was arrested on the evening of February 16, 1961, and confined in the Calcasieu Parish jail in Lake Charles. On the night of his arrest he made detailed oral and written confessions to the crimes. The next morning a sound film was made of Rideau, in the custody of state police officers, personally confessing to the crime in answer to leading questions by the Sheriff of Calcasieu Parish. The film was broadcast on the Lake Charles television station KPLC-TV on February 17, 18, and 19, 1961. Rideau v. Louisiana, 373 U.S. 723, 724-25 (1963); see also id. at 728 (Clark, J., dissenting).

After his motion for a change of venue was denied, Rideau was convicted of capital murder, La. R.S. § 14:30, by a jury and sentenced to death in the Fourteenth Judicial District Court, Parish of Calcasieu. On direct appeal to the Louisiana Supreme Court, the conviction and sentence were affirmed. Rideau I.

The United States Supreme Court granted certiorari and reversed Rideau's conviction and sentence. Rideau v. Louisiana, 373 U.S. 723 (1963). The court held "that it was a denial of due

2

process of law to refuse the request for a change of venue, after the people of Calcasieu Parish had been exposed repeatedly and in depth to the spectacle of Rideau personally confessing in detail to the crimes with which he was later to be charged." Id. at 726.

Upon remand of the case to the state Fourteenth Judicial District Court in Calcasieu Parish, the district attorney moved the trial court to order Rideau to show cause why a change of venue should not be made to a Parish outside the range of KPLC-TV in Lake Charles. Rideau joined in the motion. The state district court denied the motion, but the Louisiana Supreme Court reversed, granted the motion, and ordered the trial judge to grant a change of venue. State v. Rideau, 165 So. 2d 282 (La. 1964).

Venue was changed to the Nineteenth Judicial District Court for the Parish of East Baton Rouge. Prior to trial Rideau, who is an African-American, moved to quash his 1961 indictment by the Calcasieu Parish grand jury on the ground that there had been a systematic exclusion, through a token inclusion, of black jurors from the grand jury. After an evidentiary hearing, his motion was denied. Rideau was convicted by a jury of capital murder in East Baton Rouge Parish, La. R.S. § 14:30, and sentenced to death. The Louisiana Supreme Court affirmed the conviction and sentence. State v. Rideau, 193 So. 2d 264 (La. 1967) (Rideau II). The court held that Rideau had failed to establish discrimination or any impropriety in the formation of the jury bodies. The United States

3

Supreme Court denied certiorari. <u>Rideau v. Louisiana</u>, 389 U.S. 861 (1967). Racially discriminatory grand jury selection was one of the many errors unsuccessfully urged in Rideau's petition for certiorari.

In 1967, Rideau petitioned the United States District Court for the Eastern District of Louisiana for a writ of habeas corpus. Among numerous grounds, Rideau urged the issue of racial discrimination in the formation of the grand jury. However, all those issues were pretermitted when the State conceded that reversal of Rideau's conviction and sentence was required by the recent decision of <u>Witherspoon v. Illinois</u>, 391 U.S. 510 (1968) (holding a death sentence invalid when jurors were excluded for cause because of general objections to death penalty). Accordingly, the federal district court, on May 12, 1969, vacated Rideau's conviction and death sentence, reserving the State's right to re-try petitioner within a reasonable time in accordance with law. S.J.T. III, at 16-17.[1]

Prior to his retrial, Rideau again moved the Nineteenth Judicial District Court in East Baton Rouge Parish to quash his 1961 indictment by the Calcasieu Parish grand jury because of

---

[1] To distinguish between the records in the trials and proceedings involved in this appeal, we cite the records in the state jury trials and the federal habeas proceedings as follows: first, second, and third state jury trial records as "S.J.T. I, II, and III"; the federal district court's habeas proceeding record on the instant petition as "F.H.P." A copy of the federal district court's grant of habeas relief in 1969 is filed in S.J.T. III, at 16-17.

4

racial discrimination in selection of jury venires and their failure to represent a cross-section of the community. After an evidentiary hearing, Rideau's motions were denied. Rideau was convicted by an East Baton Rouge Parish jury of capital murder and sentenced to death.

On appeal to the Louisiana Supreme Court, Rideau argued numerous bills of exception, including an objection to the district court's denial of his motion to quash his indictment. The court rejected all of Rideau's bills as being without merit and affirmed his conviction. State v. Rideau, 278 So. 2d 100, 103-06 (La. 1973) (Rideau III). But the court concluded that, in light of the United States Supreme Court's decision in Furman v. Georgia, 408 U.S. 238 (1972), Rideau's death sentence could not be affirmed. Therefore, the Louisiana Supreme Court annulled Rideau's death sentence and ordered the trial court to sentence him to life imprisonment. Rideau III, 278 So. 2d at 106. Rideau's counsel advised him that nothing further could be done for him in the courts and, therefore, did not petition the United States Supreme Court for certiorari.

Rideau filed this petition for federal habeas corpus on July 27, 1994,[2] alleging that his indictment and conviction were

_____

[2] Because Rideau's petition was filed before the April 26, 1996, effective date of the Antiterrorism and Effective Death Penalty Act (AEDPA), its provisions amending the habeas corpus statute do not apply here. Lindh v. Murphy, 521 U.S. 320, 326-27 (1997).

5

unlawfully obtained by an unconstitutionally impaneled grand jury. The State moved for dismissal of Rideau's petition as untimely under Rule 9(a) of the rules governing habeas corpus procedure. A federal magistrate judge recommended that the federal district court deny the State's dismissal motion and grant Rideau's petition for a writ of habeas corpus. After an evidentiary hearing, however, the federal district court denied Rideau's petition and granted the State's Rule 9(a) motion. The court concluded that Rideau had not proved that his "totally unreasonable" delay had not prejudiced the State's interests. Alternatively, the court denied Rideau's petition on its merits for failure to rebut with clear and convincing evidence the presumption that the state court's decisions were correct. Rideau appealed.

## II.

First, we must decide whether the district court correctly dismissed Rideau's petition for a writ of habeas corpus as untimely under Rule 9(a) of the Rules Governing Section 2254 Cases ("Section 2254 Rules"). Rules Governing Section 2254 Cases in the United States District Courts, R. 9(a), 28 U.S.C. foll. § 2254.[3]

---

[3] We review the grant of a Rule 9(a) dismissal under the same standard of review we employ for the grant of summary judgment. McDonnell v. Estelle, 666 F.2d 246, 250 (5th Cir. 1982). Therefore, we employ a de novo review, judging the propriety of the Rule 9(a) dismissal under the same standard a district court should use: "all reasonable doubts must be resolved in favor of [Rideau]. If there are unresolved factual issues, the motion must be denied. If there are no factual issues to be resolved, the court must decide whether [the State] is entitled to judgment as a matter of law." Id.; see also 17A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL

6

Rule 9(a) of the Section 2254 Rules allows for the dismissal of habeas petitions that are filed in a delayed manner under limited circumstances:

> A petition may be dismissed if it appears that the state of which the respondent is an officer has been prejudiced in its ability to respond to the petition by delay in its filing unless the petitioner shows that it is based on grounds of which he could not have had knowledge by the exercise of reasonable diligence before the circumstances prejudicial to the state occurred.

28 U.S.C. foll. § 2254 (2000).[4]

The State bears a heavy burden under Rule 9(a) to "(1) make a particularized showing of prejudice, (2) show that the prejudice was caused by the petitioner having filed a late petition, and (3) show that the petitioner has not acted with reasonable diligence as a matter of law." Walters v. Scott, 21 F.3d 683, 686-87 (5th Cir.

_____

PRACTICE AND PROCEDURE § 4268.2 at 504-05 (2d ed. 1988).

[4] In its original form as proposed by the Supreme Court, the rule would have included a provision creating a presumption that the State was prejudiced by delays of more than five years. However, the House Judiciary Committee struck that provision from the rule passed by Congress, stating that "it is unsound policy to require the defendant to overcome a presumption of prejudice." H.R. Rep. No. 1471, 94th Cong., 2d Sess. 5, reprinted in 1976 U.S.C.C.A.N. 2478, 2481; see also Wise v. Armontrout, 952 F.2d 221, 223 & n.5 (8th Cir. 1991) (collecting cases from the 5th, 10th, and 11th circuits rejecting the notion that the original formulation of the proposed rule created a presumption that extraordinarily long delays created prejudice as a matter of law); Strahan v. Blackburn, 750 F.2d 438, 441 (5th Cir. 1985) (observing that the effect of such a provision–in creating a statute of limitations for habeas petitions–is arguably prohibited by the Constitution's mandate against suspension of the habeas writ (citing U.S. CONST. art. I, § 9, cl. 2)); Marks v. Estelle, 691 F.2d 730, 732 n.3 (5th Cir. 1982); McDonnell, 666 F.2d at 251.

1994); see also Strahan, 750 F.2d at 441 (5th Cir. 1985). The State must make a particularized showing of prejudice to its ability to respond to the habeas petition. Walters, 21 F.3d at 687; see also Strahan, 750 F.2d at 441. Mere passage of time alone is never sufficient to constitute prejudice. Walters, 21 F.3d at 687; see also Strahan, 750 F.2d at 441; McDonnell, 666 F.2d at 251; see, e.g., Bedford v. Attorney General of Alabama, 934 F.2d 295, 299-300 (11th Cir. 1991) (refusing to grant Rule 9(a) dismissal where The State did not show particularized prejudice from 19-year delay between finality of conviction and commencement of any post-conviction relief efforts); Campas v. Zimmerman, 876 F.2d 318, 324 (3d Cir. 1989) (same, regarding a 17-year delay between conviction and filing for federal habeas relief); Hannon v. Maschner, 845 F.2d 1553, 1557 (10th Cir. 1988) (same, regarding a 25-year delay between finality of conviction and filing for federal habeas relief); Buchanon v. Mintzes, 734 F.2d 274, 281-82 (6th Cir. 1984) (same, regarding a 23-year delay between conviction and filing for federal habeas relief); Sutton v. Lash, 576 F.2d 738, 744 (7th Cir. 1978) (same, regarding 21-year delay between finality of conviction and filing for federal habeas relief); Hairston v. Cox, 459 F.2d 1382, 1386 (4th Cir. 1972) (refusing to grant dismissal on theory of laches, which Rule 9(a) subsequently codified, regarding 26-year delay between finality of conviction and filing for federal habeas relief); Hamilton v. Watkins, 436 F.2d 1323, 1326 (5th Cir. 1970)

8

(same, regarding a 38-year delay between conviction and filing for federal habeas relief); <u>Hawkins v. Bennett</u>, 423 F.2d 948, 951 (8th Cir. 1970) (same, regarding 42-year delay between finality of conviction and filing for federal habeas relief).  Prejudice to the State's ability to retry or reconvict the petitioner is irrelevant. <u>Walters</u>, 21 F.3d at 687 (citing <u>Vasquez v. Hillery</u>, 474 U.S. 254, 264-65 (1986); 17A WRIGHT, MILLER & COOPER, FEDERAL PRACTICE AND PROCEDURE § 4268.2 (2d ed. 1988) (first edition to same effect quoted with approval in <u>Strahan</u>, 750 F.2d at 441)).

"[L]apses of time that affect the state's ability, but that do not make it 'virtually impossible' for the state to respond, [do not] require dismissal."  2 JAMES S. LIEBMAN & RANDY HERTZ, FEDERAL HABEAS CORPUS PRACTICE AND PROCEDURE § 24.3 at 928-29 (3d ed. 1998) (citing, inter alia, <u>Baxter v. Estelle</u>, 614 F.2d 1030, 1035 (5th Cir. 1980); <u>Strahan</u>, 750 F.2d at 443-44; <u>Galtieri v. Wainwright</u>, 582 F.2d 348, 357 n.20, 358 (5th Cir. 1978) (en banc) (dicta)).  "Accordingly, as to claims based on in-court proceedings or ones that otherwise were recorded, the state generally must show <u>both</u> that the transcript is unavailable <u>and</u> that participants in the proceeding-the presiding judge, court reporter, prosecutor, petitioner's trial attorney, law enforcement officials, and the like—are unavailable or unable to remember the critical events."  <u>Id.</u> at 929 (emphasis in original) (comparing <u>Walters</u>, 21 F.3d at 687-89, <u>Bedford</u>, 934 F.2d at 299-300, and <u>Smith v. Duckworth</u>, 910 F.2d 1492, 1495 (7th Cir. 1990),

9

with <u>Walton v. Attorney General</u>, 986 F.2d 472, 476 (11th Cir. 1993); and citing generally <u>Harris v. Pulley</u>, 885 F.2d 1354, 1365-67 (9th Cir. 1989), and <u>Strahan</u>, 750 F.2d at 441 n.4). "To determine whether this burden is met, the court generally must conduct a hearing on the question and make specific findings as to prejudice." <u>Id.</u> at 929-30 (citing <u>Walters</u>, 21 F.3d at 687 (finding State's claim of witness's memory loss insufficient to prove prejudice without a hearing to determine the precise extent of witness's recollection); <u>Hannon</u>, 845 F.2d at 1556 n.6; <u>Lawrence v. Jones</u>, 837 F.2d 1572, 1574-75 (11th Cir. 1988) (finding that, because the State was required to show "that the prejudice would not have resulted had the writ been filed at an earlier time, [t]he district court needs to determine when the prejudicial deaths occurred and any other circumstances that would show that Alabama would have been in a position to show the facts surrounding [the petitioner's] conviction had he only brought his claim earlier" (citation omitted); <u>McDonnell</u>, 666 F.2d at 254-55).

If the State makes its prima facie showing of prejudice, then the burden shifts to the petitioner, who must show either (1) that the State's showing of prejudice is false, or (2) that the delay resulted from grounds that the petitioner could not have known of through reasonable diligence prior to the occurrence of the prejudicial circumstances. <u>Walters</u>, 21 F.3d at 687; <u>see also</u> <u>Strahan</u>, 750 F.2d at 441.

10

Rule 9(a) codifies the application of the equitable doctrine of laches to habeas corpus petitions.  Walters, 21 F.3d at 686 (citing Strahan, 750 F.2d at 440).  "The application of Rule 9(a) must be carefully limited to avoid abrogating the purpose of the writ of habeas corpus."  Id. (citing McDonnell, 666 F.2d at 251; Hannon, 845 F.2d at 1557).

B.

Rideau's habeas claim, asserting that the Calcasieu Parish grand jury that indicted him was unconstitutionally formed through racially discriminatory selection procedures, is based primarily on the transcripts of the two pretrial evidentiary hearings held in the East Baton Parish state court on his motions to quash the Calcasieu Parish grand jury indictment and grand jury bodies.  The transcript of the first hearing on November 5, 1964, was introduced as evidence in the second hearing on December 15, 1969.  Both have been made part of the record of this appeal.

Acton Hillebrandt was elected Clerk of Court of Calcasieu Parish in 1948 and, as such, served as an ex-officio member of its jury commission.  As he was still in office during both evidentiary hearings, he was called at each proceeding to testify as to the jury commission's procedures used to select the Calcasieu jury bodies.  At the first evidentiary hearing, Mr. Hillebrandt testified that he had attended every meeting of the jury commission except possibly one since 1948.  He testified that the commission

11

obtained the names, race, and other data regarding prospective jurors from the parish registrar of voters and other sources. The commission prepared an identification card for each potential venire person showing his or her race and other information. During his testimony, Mr. Hillebrandt examined one of the identification cards and affirmed that it indicated the race of the venire member. The commission, consisting of Mr. Hillebrandt and five other commissioners appointed by the court, all of whom were white men, met together and selected the names from the cards to make up a general venire list of 300 people. The commission selected twenty people from the general venire to form the grand jury venire. They "pick[ed] any name that they thought would be a good grand juror . . . levelheaded." They did not select the jurors by lot or randomly. Mr. Hillebrandt testified that, as a rule, he selected people based on their occupations or his personal knowledge of them. He stated that he made it a point to put a "member of the colored race" on every grand jury that he drew. He testified that, because a conviction had been reversed "many years before" Rideau's grand jury was selected, the commissioners "all knew that they might as well be sure there was some Negroes in the panel[.]" On the other hand, Mr. Hillebrandt testified that a person's race would not qualify or disqualify him from serving on either the grand or general jury venire. In response to a question by the State's attorney, Mr. Hillebrandt agreed that the practice

12

and procedure that the commission followed in connection with the grand jury venire in Rideau's case was "one of long standing and of long vintage." He added that, when the grand jury venire was selected, "we had no idea what would come before it, Rideau or who." Mr. Hillebrandt also testified that grand jury foremen were selected from the grand jury venire by the presiding judge, and that to his knowledge no member of the "colored race" had ever served as foreman. He stated that, from the names of the venire members on the grand jury venire list, he could tell that at least one of the twenty venire persons in Rideau's case was black and that sixteen were white. Rideau's attorney subsequently introduced the jury commission's identification cards for the three remaining grand jury venire members, indicating that those three venire members were white, along with an affidavit by Mr. Hillebrandt verifying the authenticity of the cards and explaining the racial coding contained on them.

In addition, Rideau introduced as evidence two of the identification cards used by the commission in drawing general and grand jury venires, showing how the cards indicated each potential venire member's race with either a "W" or an "N"; the 1960 U.S. Census results for Calcasieu Parish indicating that 18.5% of the Parish's male population over the age of 21 was African-American; and an affidavit by the Calcasieu Parish Registrar of Voters providing a breakdown of registered voters by race, showing that

13

approximately 16% of the registered voters were African-Americans.

At the second evidentiary hearing, Mr. Hillebrandt gave a similar description of the jury commisssion's procedures. He admitted that neither he nor any other commissioner, to his knowledge, had ever made a conscious effort to discover or solicit potential jurors from the black community. Mr. Hillebrandt testified that, after the 300 general venire members were selected, their identification cards were placed in a metal container, and names were drawn therefrom to select the twenty-person grand jury venire. Mr. Hillebrandt testified that "usually you couldn't help but be" conscious of the race of the individuals in selecting the grand jury venire because the cards bore either a "W" or an "N" to denote race. Rideau also introduced as evidence four of the original twenty race-coded cards from which the jury venire was selected, the 1960 Census information, the voter registrar's affidavit, and the transcript of the 1964 evidentiary hearing.

In overruling Rideau's motion to quash after each hearing, the state trial court assigned differing reasons. After the first hearing, the court concluded that the commissioners properly took into account the race of potential venire persons to determine whether they were of good character and standing; that the commission's access to this information was not improper because there was no showing of purposeful exclusion or inclusion on the basis of race; and that the commissioners had no duty to go out and

14

investigate 300 people. After the second hearing the court overruled the motion to quash because "the authority to that by which I am bound, whether I agree or disagree, is the Banks case wherein the Supreme Court had before it these same principles."[5]

In appealing his third conviction to the Louisiana Supreme Court, Rideau again argued, among numerous other issues, that the trial court committed reversible error in denying his motion to quash the Calcasieu Parish grand jury bodies and indictment because of racial discrimination in the bodies' composition. In rejecting this argument, the Louisiana Supreme Court stated:

> The majority of the contentions raised by defense counsel in this bill of exceptions were presented on appeal and considered by us in [Rideau II]. In deciding adversely to defendant, we stated:
>
>> Fairness in the formation of the jury bodies is a fundamental requirement, long recognized by this Court. . . . Both the state and federal constitutions require that jury bodies be selected without discrimination because of race. A planned limitation of the number of negroes selected to serve on the grand jury imposed on the basis of race is prohibited. . . .

---

[5] We have been unable to find the "Banks case," upon which the state trial court relied without citation. It is possible that the court was referring to the similarly named relevant case of Eubanks v. Louisiana, 356 U.S. 584 (1958). If so, the court misread Eubanks, which held that "a criminal defendant is denied the equal protection of the laws guaranteed by the Fourteenth Amendment if he is indicted by a grand jury or tried by a petit jury from which members of his race have been excluded because of their race[,]" and concluded "that the uniform and long-continued exclusion of Negroes from grand juries shown by this record cannot be attributed to chance, to accident, or to the fact that no sufficiently qualified Negroes have ever been included in the lists submitted to the various local judges." Id. at 585, 587.

15

> The question of whether racial or other discrimination has been practiced in the formation of the jury bodies is one of fact. . . . The burden of establishing such discrimination rests upon the defendant. . . .
>
> The Jury Commission of Calcasieu Parish selected the list of Grand Jurors on January 5, 1961, before the commission of the crime charged. Clearly, therefore, no action of the jury officials could have been designed to prejudice the defendant.

> Out of an abundance of caution, we have studied this bill and find that defendant has not shown that he suffered any prejudice from the venire selection in Calcasieu Parish. . . .Purposeful discrimination may not be assumed or merely asserted, it must be proved. A defendant who claims discrimination has the burden of establishing that such was the fact. The mere establishment of disparity between the number of Negroes on a venire list and the number of whites does not make a prima facie case of discrimination which must stand where not rebutted by the State.

State v. Rideau, 278 So. 2d 100, 103-04 (La. 1973) (Rideau III) (citations omitted).[6]

The federal habeas district court, in granting the Rule 9(a) dismissal, held that the State had made a "particularized" showing of prejudice by alleging that the venire identification card

_____

[6] But see id. at 107-08 (Barham, J. dissenting) ("It cannot be seriously contended that this defendant failed to make out a prima facie case of purposeful racial discrimination in the selection of the grand jury venire. He has established that only 5 per cent of the grand jury venire was black, while the population of Calcasieu Parish 21 years or older was 25 per cent black. That grand jury venire was selected, not at random, but with the commissioners' full knowledge of the race of each person selected. But here, as in Alexander, it is not necessary that we 'rest our conclusion that petitioner has demonstrated a prima facie case of invidious racial discrimination on statistical improbability alone, for the selection procedures themselves were not racially neutral.'" (citing Alexander v. Louisiana, 405 U.S. 625 (1972); Whitus v. Georgia, 385 U.S. 545 (1967)).

exhibits were missing and that Mr. Hillebrandt, the other jury commissioners, and the presiding judges were unavailable as witnesses. After citing these factors, the court stated:

> The big issue is whether or not the court believes that the defendants, the state of Louisiana, has made a particularized showing of prejudice. And I think they have. I think to have someone wait as long as Mr. Rideau has waited, and we are now approaching the year 2000, and this crime occurred in 1961, with the final judgment in this case being in 1973, the court finds that this is a totally unreasonable time as a matter of law for the defendant to wait to raise this issue[.]

Hence, the federal district court did not make specific findings as to the particular ways in which the State had been prejudiced in its ability to respond to the petition by the unavailability of the witnesses or the venire identification card exhibits.

## C.

It is apparent that the State failed to meet its heavy burden of (1) making a particularized showing that it has been prejudiced in its ability to respond to the petition; or, (2) assuming arguendo that prejudice exists, showing that that prejudice was caused by Rideau's having filed a delayed petition. Therefore, we need not reach (3) the issue of whether the petitioner has not acted with reasonable diligence as a matter of law.

### (1)

The State claims that it has been prejudiced in its ability to respond to the petition because Acton Hillebrandt, the other members of the jury commission, and the two state trial judges are either too elderly to recall specific details, deceased, or are at

17

unknown locations.  To meet its burden of making a particularized showing of prejudice, however, the State may not merely allege prejudicial facts, but must offer concrete proof of the allegations.  Wise, 952 F.2d at 223; accord Marks, 691 F.2d at 732, 734; Paprskar v. Estelle, 612 F.2d 1003, 1008 (5th Cir. 1980); see also Jackson v. Estelle, 570 F.2d 546, 547 (5th Cir. 1978) ("[P]roblems of proof attendant to claims regarding events which occurred over 30 years ago . . . 'alone [are] no bar to federal habeas relief'" (quoting Hamilton v. Watkins, 436 F.2d 1323, 1326 (5th Cir. 1970))); Hudson v. Alabama, 493 F.2d 171, 173 (5th Cir. 1974) (holding that there is no prejudice if crucial facts are not in doubt); see generally, LIEBMAN & HERTZ, supra, § 24.3 at 927 n.3 (citing and quoting foregoing authorities).

The State alleged but did not present concrete proof that Mr. Hillebrandt was physically or mentally unable to testify regarding the Calcasieu Parish grand jury selection procedures.  Further, the State has not alleged the factual substance of such testimony by Mr. Hillebrandt or even alleged that it would differ from the transcripts of his testimony at the two state court evidentiary hearings.  See Walters, 21 F.3d at 688 (noting that, "[i]f the state wishes to establish prejudice from the death of the court reporter and the unavailability of the court reporter's records, it must also establish that the substance of those records is unavailable from other sources.  This the state has not done.");

18

McDonnell, 666 F.2d at 253 ("[P]rejudice resulting from the judge's death occurs only if there are no other sources from which the state can obtain the requisite information to counter the petitioner's claim.").

At the evidentiary hearing in the federal district court in the present case, the parties stipulated that four of the jury commissioners and one of the state court judges were deceased as of January 1999. However, the State has not alleged or proved with concrete evidence the date upon which each of the witnesses died or became unavailable, the date upon which Rideau's delay became unreasonable, or the substance of each witness's testimony that has been lost during the specific period of Rideau's allegedly unreasonable delay. See, e.g., McDonnell, 666 F.2d at 253-54 (finding that prejudice had not been established because the State had not shown when records were destroyed during the course of delay and whether an earlier filing would have made a fuller response possible); see also Lonchar v. Thomas, 517 U.S. 314, 327 (1996) ("[H]istory of the Rule [9(a)] makes plain that the prejudice requirement represents a critical element in the balancing of interests undertaken by Congress and the framers of the Rule which courts may not undermine through the exercise of background equitable powers."); Prejean v. Smith, 889 F.2d 1391, 1405 (5th Cir. 1989) ("This circuit has held that no matter how long the delay may be, a particularized showing of prejudice is

19

required.").

The State also argues that it has been prejudiced by the disappearance from the state trial records of the race-coded identification cards and other documentary exhibits. However, the State does not make any particularized showing of prejudice from this disappearance. Furthermore, Mr. Hillebrandt described the identification cards fully in his testimony at the two state evidentiary hearings, and the transcripts of that testimony have been fully preserved, making the availability of the cards themselves unnecessary in these proceedings. See Walters, 21 F.3d at 688; McDonnell, 666 F.2d at 253.

(2)

Assuming arguendo that the death, disability, or unavailability of each witness is construed as prejudicial to the State, the State bears the further burden of proving that Rideau's delay in filing his habeas petition caused all sources of the evidence each could have provided to be lost. At a minimum, this requires the State to establish that if Rideau had filed his habeas petition at a specific earlier time, the evidence the State claims to have lost would have been available and material. The witnesses may have died or become unavailable before or shortly after Rideau's conviction and sentence became final in the Louisiana Supreme Court. In that case, the loss of the witnesses' testimony certainly would not be attributable to Rideau's delay in bringing

20

his habeas petition. Moreover, the State apparently failed to take advantage of opportunities during the two state evidentiary hearings to present the testimony of the jury commissioners it now claims are deceased or unavailable. The State has not alleged or proved any facts to show that the loss of those witnesses is not attributable to its own lack of diligence. We simply do not have the necessary facts before us. The State has the burden to prove those facts; the absence of their proof compels the conclusion that the necessary foundation for a Rule 9(a) dismissal has not been laid. See Walters, 21 F.3d at 688-89 (citing and quoting Lawrence, 837 F.2d at 1575 (11th Cir. 1988) ("The district court needs to determine when the prejudicial deaths occurred and any other circumstances that would show that [the State] would have been in a position to show the facts surrounding [petitioner's] conviction had he only brought his claim earlier." (footnote omitted)); McDonnell, 666 F.2d at 249 (noting as dispositive the State's failure to show when the records were destroyed and, consequently, that petitioner's delay caused prejudice); Marks, 691 F.2d at 733 ("[T]he state's Rule 9(a) motion is meritorious only if it suffered some prejudice after the lapse of a reasonable amount of time for Marks to learn of [the Argersinger] decision and act.").

(3)

Because we hold that the State has failed to make a sufficient showing of prejudice in its ability to respond to the petition that

21

was caused by the petitioner's delay, it is unnecessary for us to determine whether Rideau's delay in filing his petition was unreasonable. <u>Walters</u>, 21 F.3d at 686-87; <u>see also</u> <u>Strahan</u>, 750 F.2d at 441, 443; <u>McDonnell</u>, 666 F.2d at 251; <u>Bouchillon v. Estelle</u>, 628 F.2d 926, 929 (5th Cir. 1980); <u>Smith</u>, 910 F.2d at 1492; <u>see generally</u> LIEBMAN & HERTZ § 24.3, at 926 n.1 (citing and quoting from foregoing cases).[7]


### III.

Because the State failed to carry its burden under Rule 9(a), we turn to a review of the decisions of the state courts and the federal district court on the merits of Rideau's petition for habeas corpus. In a federal habeas corpus proceeding, we review the district court's legal determinations de novo. <u>Johnson v. Puckett</u>, 929 F.2d 1067, 1070 (5th Cir. 1991). We review state court rulings of law or mixed rulings of law and fact de novo in habeas proceedings. <u>Id.</u> at 1072 (citing <u>Sumner v. Mata</u>, 455 U.S. 591, 597 (1982)). In habeas proceedings under the pre-AEDPA 28 U.S.C. § 2254, we accord a rebuttable presumption of correctness to written state court findings of fact. 28 U.S.C. § 2254(d) (1994); <u>Sumner</u>, 455 U.S. at 592.

---

[7] Although we do not decide the issue of the reasonableness of Rideau's delay, the author of this opinion certifies that his careful examination of the record reveals no evidence that supports the State's assertion of purposeful delay for tactical advantage by the petitioner.

22

In the present case, the State did not introduce any evidence in either the federal or the state courts to rebut the evidence taken in the state trial court hearings on Rideau's motions to quash the Calcasieu Parish grand jury indictment. As a consequence, the federal district court and the state courts were not required to make any purely factual determinations that we are called upon to review. Rather, we review their decisions only for error in rulings of law or mixed rulings of fact and law.

A.

For well over a century, the Supreme Court has held that a criminal conviction of an African-American cannot stand under the Equal Protection Clause of the Fourteenth Amendment if it is based on an indictment of a grand jury from which African-Americans were excluded on the basis of race. See Rose v. Mitchell, 443 U.S. 545, 556 (1979); Alexander v. Louisiana, 405 U.S. 625, 628 (1972); Bush v. Kentucky, 107 U.S. 110, 119 (1883); Neal v. Delaware, 103 U.S. 370, 394 (1881); see also Castaneda v. Partida, 430 U.S. 482, 492-95 & n.12 (1977). Recently the Supreme Court reaffirmed this principle in holding that a white criminal defendant has the requisite standing to raise equal protection and due process objections to discrimination against black persons in the selection of grand juries. Campbell v. Louisiana, 523 U.S. 392, 397-401 (1998). "Regardless of his or her skin color, the accused suffers a significant injury in fact when the composition of the grand jury

23

is tainted by racial discrimination.  '[D]iscrimination on the basis of race in the selection of members of a grand jury . . . strikes at the fundamental values of our judicial system' because the grand jury is a central component of the criminal justice process."  Campbell, 523 U.S. at 398 (1998) (quoting Rose, 443 U.S. at 556).

A criminal defendant "is entitled to require that the State not deliberately and systematically deny to members of his race the right to participate as jurors in the administration of justice." Alexander, 405 U.S. at 628-29.  Accordingly, where sufficient proof of discrimination in violation of the Fourteenth Amendment has been made out and not rebutted, the Supreme Court uniformly has required that the conviction be set aside and the indictment returned by the unconstitutionally constituted grand jury be quashed.  See, e.g., Hill v. Texas, 316 U.S. 400, 406 (1942).  In Castaneda, the Court noted that among the cases in which the Court had applied this principle in circumstances involving grand jury discrimination were Alexander, supra; Arnold v. North Carolina, 376 U.S. 773 (1964); Eubanks, supra; Reece v. Georgia, 350 U.S. 85 (1955); Cassell v. Texas, 339 U.S. 282 (1950); Hill, supra; Smith v. Texas, 311 U.S. 128 (1940); Pierre v. Louisiana, 306 U.S. 354 (1939); Rogers v. Alabama, 192 U.S. 226 (1904); Carter v. Texas, 177 U.S. 442 (1900); and Bush v. Kentucky, supra.  430 U.S. at 492 n.12.

These holdings make clear that claims of discrimination in the

24

selection of members of the grand jury are cognizable on federal habeas corpus, and will support issuance of a writ setting aside a state conviction and ordering the indictment quashed. <u>Rose</u>, 443 U.S. at 564-65. Nevertheless, to be entitled to habeas relief a claimant is required to prove discrimination under the standards set out in the Supreme Court's cases. <u>Id.</u> That is, "in order to show that an equal protection violation has occurred in the context of grand jury selection, the defendant must show that the procedure employed resulted in substantial underrepresentation of his race or of the identifiable group to which he belongs." <u>Castaneda</u>, 430 U.S. at 494. Specifically, Rideau was required to prove his prima facie case with regard to selection of the grand jury as follows:

> The first step is to establish that the group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied. Next, the degree of underrepresentation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors, over a significant period of time. This method of proof, sometimes called the "rule of exclusion," has been held to be available as a method of proving discrimination in jury selection against a delineated class. Finally, . . . a selection procedure that is susceptible of abuse or is not racially neutral supports the presumption of discrimination raised by the statistical showing. Once the defendant has shown substantial underrepresentation of his group, he has made out a prima facie case of discriminatory purpose, and the burden then shifts to the State to rebut that case.

<u>Id.</u> at 494-95 (citations and footnote omitted).

The petitioner may also prove a prima facie case without showing a statistical disparity "over a significant period of

25

time"; he may satisfy his prima facie burden by showing a disparity in the particular grand jury body that indicted him, coupled with proof either that (1) the selection process was itself not racially neutral and presented an opportunity for discrimination, or that (2) the jury commissioners had made no attempt to acquaint themselves with eligible members of the African-American community. Id. at 493-94 (quoting Washington v. Davis, 426 U.S. 229, 241 (1976) ("A prima facie case of discriminatory purpose may be proved as well by the absence of Negroes on a particular jury combined with the failure of the jury commissioners to be informed of eligible Negro jurors in a community . . . or with racially non-neutral selection procedures.")); cf. Batson v. Kentucky, 476 U.S. 79, 94-95 (1986) (regarding the selection of petit jury venires, holding that, "[s]ince the ultimate issue is whether the State has discriminated in selecting the defendant's venire, however, the defendant may establish a prima facie case in other ways than by evidence of long-continued unexplained absence of members of his race from many panels. In cases involving the venire, this Court has found a prima facie case on proof that members of the defendant's race were substantially underrepresented on the venire from which his jury was drawn, and that the venire was selected under a practice providing the opportunity for discrimination. This combination of factors raises the necessary inference of purposeful discrimination because the Court has declined to

26

attribute to chance the absence of black citizens on a particular jury array where the selection mechanism is subject to abuse." (internal quotations and citations omitted)).

Because racial discrimination in the grand jury selection process "strikes at the fundamental values of our judicial system and our society as a whole," it is well-established that a criminal defendant has suffered an equal protection violation when he is indicted by a grand jury that is the product of such a discriminatory process. Rose, 443 U.S. at 556 (citing Neal, 103 U.S. at 394; Reece, 350 U.S. at 87). "Since the beginning," the United States Supreme Court has "reversed the conviction and ordered the indictment quashed in such cases without inquiry into whether the defendant was prejudiced in fact by the discrimination at the grand jury stage." Id. at 556-57 (citing Neal, 103 U.S. at 394; Bush, 107 U.S. at 119; Virginia v. Rives, 100 U.S. 313, 322 (1880)).

> [N]o state is at liberty to impose upon one charged with crime a discrimination in its trial procedure which the Constitution, and an Act of Congress passed pursuant to the Constitution, alike forbid. Nor is this Court at liberty to grant or withhold the benefits of equal protection, which the Constitution commands for all, merely as we may deem the defendant innocent or guilty. It is the state's function, not ours, to assess the evidence against a defendant. But it is our duty as well as the state's to see to it that throughout the procedure for bringing him to justice he shall enjoy the protection which the Constitution guarantees. Where, as in this case, timely objection has laid bare a discrimination in the selection of grand jurors, the conviction cannot stand, because the Constitution prohibits the procedure by which it was obtained. Equal protection of the laws is something more than an abstract right. It is a command which the state must

27

respect, the benefits of which every person may demand.  Not
the least merit of our constitutional system is that its
safeguards extend to all-the least deserving as well as the
most virtuous.

Hill, 316 U.S. at 406 (citations omitted).

B.

The ultimate question in the present case, whether the grand jury was selected in a systematically unrepresentative or racially discriminatory manner, has long been recognized to be a question of law or a mixed question of fact and law. See, e.g., Rose, 443 U.S. at 561-62; Whitus, 385 U.S. at 550; Hill, 316 U.S. at 406; Cassell, 339 U.S. at 291-92 (Frankfurter, J., concurring).[8]

Rideau, as an African-American, is a member of a distinct, cognizable class that has been singled out for discrimination. Rose, 443 U.S. at 555-56.  Rideau has also made a showing that the grand jury venire in his case was disparate in its representation of African-Americans in comparison to the proportion of African-Americans in the community.  The 1960 Census figures for Calcasieu Parish indicate that 18.5% of the parish's male population over the age of 21 was African-American.  F.H.P., at 167-69.  An affidavit by the Calcasieu Parish registrar of voters shows that 16-2/3% of

---

[8] Cf. Johnson, 929 F.2d at 1072 (finding question of whether discriminatory selection of grand jury foremen had occurred over a significant period of time to be mixed question of fact and law implicating no deference to state court's conclusion); see also Brantley v. McKaskle, 722 F.2d 187, 189 (5th Cir. 1984) ("If, however, the challenge goes to the inferences drawn from the facts, the reviewing court need not accept the [state court's] conclusion and may independently examine and weigh the facts."); see generally 1 LIEBMAN & HERTZ § 20.3d at 767-94 and n.56.

28

the registered voters in Calcasieu Parish was African-American. S.J.T. III. Nevertheless, only one member, or 5%, of the twenty-person grand jury venire was African-American, a mathematical disparity similar to those that the Supreme Court has found to establish a presumption of discrimination. See Castaneda, 430 U.S. at 495-96 (finding a presumption of discrimination where 79.1% of county's population was Mexican-American but only 39% of people summoned to grand jury service were Mexican-American) (citing Whitus, 385 U.S. at 550 (27.1%-to-9.1% disparity); Sims v. Georgia, 389 U.S. 404 (1967) (24.4%-to-4.7% disparity); Jones v. Georgia, 389 U.S. 24 (1967) (19.7%-to-5% disparity)). This 18.5%-to-5% disparity between the distinct group's presence in the community population and its representation on the grand jury venire in Rideau's case might, standing alone, support a presumption of discrimination. We need not decide that, however. The Supreme Court has stressed that it

> has never announced mathematical standards for the demonstration of "systematic exclusion of blacks but has, rather, emphasized that a factual inquiry is necessary in each case that takes into account all possible explanatory factors. The progressive decimation of potential Negro grand jurors is indeed striking here, but we do not rest our conclusion that petitioner has demonstrated a prima facie case of invidious racial discrimination on statistical improbability alone, for the selection procedures themselves were not racially neutral.

Alexander, 405 U.S. at 630. Here, as well, additional factors supplement the statistical disparity. For example, Mr. Hillebrandt

29

testified that neither he nor any of the other commissioners, to his knowledge, had made any attempt to identify and call upon eligible African-Americans for potential selection as general or grand jury venire persons. Washington, 426 U.S. at 241 (holding that a presumption of prejudice is shown when the disparity on a particular grand jury venire panel is "combined with the failure of the jury commissioners to be informed of eligible" African-Americans in the community); Smith v. Texas, 311 U.S. 128, 132 (1940) ("Where jury commissioners limit those from whom grand juries are selected to their own personal acquaintance, discrimination can arise from commissioners who knew no negroes as well as from commissioners who know but eliminate them."); Scott v. Walker, 358 F.2d 561, 573-74 (5th Cir. 1966) (en banc) ("It is plain from the record here that the commissioners put on the list only those personally known to them. They made no especial effort to ascertain whether there were qualified Negroes in the parish for jury service. In failing to do so they violated the rule announced by the Supreme Court . . . in Cassell v. State of Texas, where it was said, 'When the commissioners were appointed as judicial administrative officials, it was their duty to familiarize themselves fairly with the qualifications of the eligible jurors of the county without regard to race and color. They did not do so here, and the result has been racial discrimination.'" (quoting 339 U.S. at 289)).

Also, it is evident that the degree of underrepresentation of African-Americans on the general and grand jury venires had prevailed over a significant period of time.  According to Mr. Hillebrandt, who had attended virtually all of the meetings of the jury commission since his election in 1948, the commission's venire selection practices and procedures were of long standing and long vintage in Calcasieu Parish.  Many years before 1961, Mr. Hillebrandt testified, after a jury conviction had been reversed, he began the practice of making sure that there was at least one "colored person" on each grand jury venire.[9]  This practice, however, he clearly indicated, was merely a token inclusion of African-Americans and was by no means intended to rectify their underrepresentation.

Rideau introduced additional census and venire composition evidence in the proceedings before the Magistrate Judge that fully corroborates the Calcasieu Parish jury commission's long-lived pattern of discrimination against African-Americans in the selection of general and grand jury venires.  As the Magistrate Judge's report correctly found:

> The statistical evidence of under-representation is overwhelming and unrebutted.  According to the 1960 U.S. Census, Calcasieu Parish had 7,237 black men over the age of

---

[9] As the Magistrate Judge's report in these proceedings observes, "It is difficult, if not impossible, to interpret this statement, when read in context with the other facts, as anything other than an admission that jury commissioners were trying to get away with putting as few blacks on grand juries as they thought they could."

21, and 31,729 white men in the same category. Thus, about 18.5 percent of the parish's population was black and eligible for grand jury service in 1960 and 1961. According to the 1950 U.S. Census, Calcasieu Parish had 26,172 men over the age of 21. Of that number, 5,626 were black—about 21.5 percent of the eligible population.

According to undisputed evidence of the 12 grand juries that were selected between October 3, 1954 and January 16, 1961, no grand jury had more than one black member (out of 12 on each panel). Of 144 grand jurors that were selected during this period, only six were black—about four percent.

F.H.P., at 190-91 (footnote omitted). Consequently, under either standard, disproportionate underrepresentation over a significant period of time, or disproportionate underrepresentation of African-Americans in Rideau's own grand jury venire coupled with a racially non-neutral selection process and the failure of the jury commissioners to acquaint themselves with a representative number of African-Americans eligible for jury service, we conclude that Rideau proved a prima facie case of unconstitutional grand jury venire selection and composition.

A telling sign that the prevalent statistical underrepresentation of minorities on the grand jury venires resulted from racial discrimination was the commission's venire selection procedure, which was "susceptible of abuse or [was] not racially neutral." Castaneda, 430 U.S. at 494. According to Mr. Hillebrandt's testimony, as supported by the general venire identification cards introduced at the two state evidentiary hearings, and not disputed here, each potential grand jury venire member's identification information was entered onto a card that

32

also indicated the race of each person.  S.J.T. III, at 128.  In cases in which the jury commissioners have had access to the racial identity of potential grand jurors while engaged in the selection process, the Supreme Court has repeatedly found that the procedure constituted a system impermissibly susceptible to abuse and racial discrimination.  Castaneda, 430 U.S. at 495 (finding that the non-random selection of names of grand jurors was susceptible to abuse because Mexican-Americans were easily identifiable by their Spanish surnames); Alexander, 405 U.S. at 630 ("[W]e do not rest our conclusion that petitioner has demonstrated a prima facie case of invidious racial discrimination on statistical improbability alone, for the selection procedures themselves are not racially neutral. The racial designation on both the questionnaire and the information card provided a clear and easy opportunity for racial discrimination."); Whitus, 385 U.S. at 548-49 (finding a selection system was susceptible to abuse where potential grand jurors were selected from segregated tax digest lists, which also coded African-Americans with a "(c)" behind each name); cf. Avery v. Georgia, 345 U.S. 559, 562 (1953) (finding that the practice of placing potential petit jurors' identification on yellow cards if they were African-American and on white cards if they were white "[o]bviously . . . makes it easier for those to discriminate who are of a mind to discriminate." (quoted approvingly in Alexander, 405 U.S. at 631)).

33

That Mr. Hillebrandt testified that he did not intentionally seek to discriminate against prospective grand jurors by using cards bearing racial identifications, and that he did not know whether the other jury commissioners did so, does not dissipate a prima facie case established under the Court's decisions. Norris v. Alabama, 294 U.S. 587, 598 (1935) ("If, in the presence of such testimony as defendant adduced, the mere general assertions by officials of their performance of duty were to be accepted as an adequate justification for the complete exclusion of negroes from jury service, the [Equal Protection Clause] would be but a vain and illusory requirement."); see also Alexander, 405 U.S. at 630 (finding the racial identification in the selection process impermissible "although there is no evidence that the commissioners consciously selected by race"); Whitus, 385 U.S. at 551 ("While the commissioners testified that no one was included or rejected on the jury list because of race or color this has been held insufficient to overcome prima facie evidence."); Eubanks, 356 U.S. at 587 (quoting above passage from Norris); Reece, 350 U.S. at 88 ("[M]ere assertions of public officials that there has not been discrimination will not suffice."). The Supreme Court has spoken to this point in words that are equally applicable to the present case:

> As in Whitus v. Georgia, supra, the clerk of court, who was also a member of the jury commission, testified that no consideration was given to race during the selection procedure. The Court has squarely held, however, that

34

> affirmations of good faith in making individual selections are insufficient to dispel a prima facie case of systematic exclusion. . . .The result bespeaks discrimination, whether or not it was a conscious decision on the part of any individual jury commissioner.

Alexander, 405 U.S. at 632 (internal quotations and citations omitted).

Consequently, we conclude that Rideau established a prima facie case of racial discrimination in the process used to select the grand jury that indicted him. The State produced no evidence to rebut any portion of Rideau's prima facie case in either the two state evidentiary hearings or the federal district court proceedings. The only evidence the State can point to is Mr. Hillebrandt's testimony that neither he nor any other commissioner to his knowledge used the race-coded identification cards to intentionally exclude African-Americans from grand jury venires. As we have noted, however, such disclaimers are insufficient to rebut a prima facie showing of discrimination. The State must "show[] that permissible racially neutral selection criteria and procedures have produced the monochromatic result," and it has made no strides in making such a showing, either here or in the state courts. Alexander, 405 U.S. at 632.

Accordingly, Rideau's conviction must be reversed and his unconstitutionally obtained indictment quashed. Vasquez, 474 U.S. at 264 ("The overriding imperative to eliminate this systematic flaw in the charging process, as well as the difficulty of

35

assessing its effect on any given defendant, requires our continued adherence to a rule of mandatory reversal.").

> [I]ntentional discrimination in the selection of grand jurors is a grave constitutional trespass, possible only under color of state authority, and wholly within the power of the State to prevent. Thus, the remedy we have embraced for over a century–the only effective remedy for this violation–is not disproportionate to the evil that it seeks to deter. If grand jury discrimination becomes a thing of the past, no conviction will ever again be lost on account of it.

Id. at 262. However, as the Supreme Court noted in Hill, "A prisoner whose conviction is reversed by this Court need not go free if he is in fact guilty, for [the State] may indict him and try him again by the procedure which conforms to the constitutional requirements." 316 U.S. at 406. Consequently, the State of Louisiana is free to seek another indictment and retrial of Rideau in accordance with the Constitution, the laws, and this opinion.

For the foregoing reasons, we REVERSE and REMAND to the district court with instructions to issue the writ of habeas corpus unless, within a reasonable time to be designated by the district court, the State should again indict and try Rideau.